[Civ. No. 16665. Third Dist. Mar. 26, 1979.]

GEORGE R. DINKINS, Plaintiff and Respondent, v.
AMERICAN NATIONAL INSURANCE COMPANY,
Defendant and Appellant.

**COUNSEL**

Diepenbrock, Wulff, Plant & Hannegan, Lascher & Wilner and Edward L. Lascher for Defendant and Appellant.

Coben, Cooper & Zilaff and Melvyn J. Coben for Plaintiff and Respondent.

**OPINION**

**JANES, J.**—Defendant appeals from the judgment in an action brought by its insured, plaintiff George R. Dinkins. The judgment, entered upon the jury's special verdicts, awarded plaintiff (1) $1,000—the face amount of the subject insurance policy; (2) $25,000—as damages for emotional and mental distress; and (3) $25,000—in punitive damages. The judgment further reflected the jury's special finding exonerating defendant from allegations of fraud and also included an award to plaintiff of $2,750 for attorney fees, that award pursuant to a stipulation that the trial judge would determine whether attorney fees were to be awarded and, if so, the reasonable amount thereof.

The policy in question was a family life policy naming as insureds plaintiff and five of his eleven children, including his daughter Glinda Ann. The policy provided for payment to plaintiff in the amount of $1,000 upon Glinda Ann's death. Glenda Ann died of gunshot wounds during the contestable period of the policy term. Plaintiff's claim on the policy was denied, the company contending it was entitled to rescind the policy because of concealment or misrepresentation of material fact by plaintiff with respect to the state of Glinda Ann's health at the time the policy application was completed.

### FACTS

Plaintiff George Dinkins, approximately 50 years of age, had been a scrap dealer since 1963. In addition to his earnings from that occupation, his only other income was a government disability pension received because of injuries incurred in the service. He had fathered eleven children, and in May 1974, the time of application for the subject insurance policy, six or seven of them were living with him. Five were under the age of eighteen, and thus qualified for coverage under the

children's term rider offered by defendant. The premium for the policy insuring the life of plaintiff for $3,000 was $13.63 a month. The additional premium for the children's term rider was $1 per month. The policy was issued June 5, 1974, and was based on an application signed by plaintiff on May 2, 1974.

The application around which this dispute centers was completed in the course of at least two meetings between plaintiff and various of defendant's agents. Mrs. Wilma Salamone, the agent of defendant who signed plaintiff's application form as witness and soliciting agent, testified that the information on the form had been previously written in by defendant's agent Leonard Palaca. On May 2, 1974, when she went to plaintiff's home with John Carmichael, another agent, Carmichael handed her the virtually complete application for her to finish, have signed, and witness. The application had not yet been signed by plaintiff nor accepted by defendant's agent because plaintiff did not earlier have money for the premium.

Questions 19 through 22 of the application deal with the medical history and health of the proposed insureds under the policy. Question 19 specifically asked whether any proposed insured [had]:

"(a) Any abnormality, deformity, disease or disorder, or is any proposed insured presently receiving treatment or taking medicine of any kind?

"(b) Ever had a surgical operation or been advised to have an operation which was not performed.

"(c) Ever made claim for or received any insurance benefit, compensation or pension, governmental or otherwise, on account of an injury or sickness?

"(d) Ever had an x-ray, electrocardiogram, blood or urine test, or other laboratory tests? If 'Yes', state why, when, where and by whom.

"(e) Any impairment of sight or hearing?

"(f) Ever been under observation or treatment in any hospital, sanitarium, clinic or rest home?

"(g) Ever received treatment or joined an organization for alcoholism or drug addiction?

"(h) Ever, for physical or mental reason, been rejected or discharged from any branch of military service?

"(i) Ever had or been treated for high or low blood pressure, chest pain or for sugar in the urine?

"(j) Consulted or been treated or examined by any physician or practitioner for any cause not previously mentioned in the application?" The completed application contains a negative response to every subsection of question 19.

The testimony of those of defendant's agents involved in the elicitation of answers for the application was uniformly to the effect that plaintiff was specifically asked every question with respect to each proposed insured, and that his answer to each question was an unqualified negative. Plaintiff's testimony, on the other hand, is riddled with inconsistencies and contradictions. On direct examination plaintiff testified that he was not told that the health questions were to be answered with reference to each of the proposed insureds. He testified, however, that he asked Mr. Carmichael, the agent present at that time, whether Glinda would have to have a physical because she had been in the hospital for the birth of her two children, and was told that it would be unnecessary since she was under the age of eighteen. He further stated that with respect to his own health, he told Carmichael he had just had an operation to remove a cyst and was receiving a government disability pension. The application form signed by him reflects none of the information he claimed to have given Carmichael.

When asked whether he knew that Glinda Ann had been taken to the Sacramento Medical Center emergency room shortly before the time of application, plaintiff recalled that his wife mentioned to him that Glinda had had some sort of stomach trouble. On cross-examination, plaintiff denied being asked any questions by defendant's agents about the health of his children. In an earlier deposition, however, he had stated that he was specifically asked these questions as to each of his children, and had replied that each was in good health. When faced with his deposition testimony he responded that he had been asked about his children's health, and had answered that only one had been in the hospital—and that was Glinda Ann who was hospitalized for childbirth. He was then asked whether he had said anything about Glinda Ann having been taken to the medical center; his reply was "I couldn't say what I don't know." Upon being asked whether that meant he had disclosed that Glinda Ann

had been seen in the emergency room, he replied "If they asked that question, I told them." He was then asked specifically whether he had told anyone of Glinda Ann's visit to the hospital. He again replied that if they asked him he had told them, and when the question once again was put to him, he replied, "I don't remember."

As his cross-examination continued, plaintiff reiterated his earlier statement that he had never been asked health questions with respect to the children. He also retreated somewhat from his earlier testimony that he had told defendant's agents of *his own* medical problems, taking the position that he had only told them if they had asked him, and that he couldn't recall whether he had been asked.[1]

Returning to Glinda Ann's emergency treatment shortly before the policy application was completed, plaintiff testified at trial that he knew she had been taken to the hospital but understood that there was nothing wrong with her. Again, his deposition testimony was introduced where, in reply to questions about Glinda's emergency treatment, he stated that he knew she had gone both to Community Hospital and to the medical center in connection with her complaints of dizzy spells. He insisted that he didn't know that Glinda Ann had been taken to the emergency room 3 times in a period of less than 24 hours, but admitted that his wife had told him Glinda Ann was sick and that she had taken her to the hospital around midnight. He testified that he talked to the doctor the day after she was taken to the hospital and was told nothing was wrong with Glinda Ann.

Continuing on the subject of Glinda Ann, on further cross-examination, he did know that she had been taken to the hospital from juvenile hall on one occasion, possibly in early 1974, because of stomach trouble. He reiterated his awareness that his wife's trip to the medical center with Glinda Ann involved dizzy spells. The stomach pains previously referred to, he later stated, related to the juvenile hall episode rather than the midnight hospital visit. When specifically asked whether he disclosed to anybody that Glinda Ann had been taken to the hospital in 1974 because of stomach problems, he replied, "Maybe I said that. I'm not for sure."

---

[1]The exchange went as follows:
"Q. (By defense counsel): Mr. Dinkins, do you remember whether or not you did mention your hospitalization, surgery, to Mr. Carmichael and Mr. Palaca?
"A. I said again if he asked me, I told him.
"Q. Do you have any specific recollection as you sit here now?
"A. Right now, I couldn't remember back—I can't think about [*sic*] that far exactly what I said. Maybe I did and maybe I didn't."

When pressed further, he replied that he "probably" made that statement. Further attempts by counsel to clarify plaintiff's testimony reveal that if he had told anyone of hospital treatment of Glinda Ann, it could only have been with reference to her two childbirth confinements.

Because of the policy amount and plaintiff's age, defendant's rules required that plaintiff have a medical examination. At defendant's request, a biomedical technician visited plaintiff, examined him and questioned him concerning his medical history. In addition to his medical history, plaintiff informed the technician also of his disability pension from the government.

In connection with the information about Glinda Ann's two childbirths, not reflected on the policy application for the policy presently in issue, defendant's agents had available to them a computerized "life register" record which, had it been checked, would have revealed policies earlier issued by the company to Glinda Ann. The applications for those policies disclosed at least one childbirth confinement. Defendant does not contend that confinement for normal childbirth would have affected Glinda Ann's insurability.

After Glinda Ann's death, plaintiff submitted a claim for the policy proceeds. This form, in evidence at trial, reveals that he answered "none" to a question which called for the "[n]ames and addresses of all physicians or practitioners who attended or prescribed for the deceased and all hospitals and institutions where [she] was treated during last illness and during the five years prior thereto."

Defendant requested an investigation by the Retail Credit Company in Sacramento of any medical history relating to Glinda Ann. Records of the Sacramento Medical Center establish that Glinda Ann was received for emergency treatment 3 times in less than 24 hours in late March 1974. She complained at that time of extreme drowsiness and "falling out spells." The information given was that she would slump over and become unresponsive for several minutes and that she suffered incontinence and cyanosis at those times. A tentative diagnosis was made of a possible seizure disorder. The treating physicians ordered an electroencephalogram to be taken to evaluate the possible seizure condition. As far as the records show, Glinda Ann never submitted to the EEG that had been ordered and no further diagnosis was made with respect to the suspected disorder. Her medical records show many other visits for apparently unrelated conditions.

John Hathorn, defendant's underwriter, called by plaintiff as an adverse witness, testified that an underwriter would have legitimate concern about fainting and dizzy spells, and moreover, would find Glinda Ann unsuitable for insurance under the family term rider pending satisfactory resolution of the doubt created by the tentative diagnosis. An expert witness called by defendant, retired Cal-West Insurance Company underwriter Walter Kennedy, testified that any underwriter who reviewed Glinda Ann's medical records would decline to issue her life insurance coverage until the questions raised by her medical records were definitively resolved. No evidence was presented to contradict the testimony that coverage would have been denied Glinda Ann under the family term rider had her March 1974 medical history been disclosed.

Defendant contends on appeal that: (1) the award of the policy benefit to plaintiff was fatally infected by errors in the court's instructions; (2) the award of compensatory damages for emotional distress caused by defendant's breach of the implied covenant of good faith must be reversed because of insufficiency of the evidence and because of the absence of any authority for recovery of such damages where the insurance policy is one providing a lump sum death benefit; (3) the evidence is insufficient to support the award of punitive damages; and (4) no legal authority supports the award of attorney fees.

 Our review reveals that the court did in fact err in its instructions to the jury on the principal issue in this case, and that those errors were prejudicial in that, inter alia, defendant's burden of proof was so altered that it was denied a fair trial. Since reversal of the judgment is required on that basis, we reach only defendant's further claim that the trial court erred in its award of attorney fees.[2]

## DISCUSSION

Defendant submitted to the court a full set of instructions covering the correlative issues of plaintiff's right to receive the policy proceeds and defendant's right to withhold such proceeds had a misrepresentation or concealment of material fact occurred. No instructions on the issue of material misrepresentation or concealment were proposed by plaintiff. Rather than using the instructions submitted by defendant, however, the

---

[2]If it were necessary to reach defendant's contentions based on sufficiency of the evidence, we could not escape the conclusion that the evidence clearly was insufficient to support the compensatory damage award for emotional distress. Without that support, the punitive damage award necessarily is vulnerable.

court composed its own instruction on the critical issues. We necessarily set out this omnibus instruction, in its full length:

"This action has been brought by George R. Dinkins, Plaintiff, against the American National Insurance Company, Defendant, to recover the proceeds of a policy of life insurance issued by the defendant insurance company on the life of Glinda Ann Dinkins, daughter of the Plaintiff, who was killed October 14, 1974.

"Defendant contends that George R. Dinkins made *material misrepresentations* [italics added] in the application for insurance and [that it] thus rightly cancelled the contract of insurance and is relieved of the obligation to pay the benefits of the policy upon the return of the premiums paid.

"The first determination you must make is whether there was a *material misrepresentation* [italics added] by the plaintiff, George R. Dinkins, in the application for life insurance. It is the burden of the defendant American National Insurance Company to prove by a preponderance of the evidence that the application contained a *misrepresentation* [italics added] of a material fact which misled the insurer in accepting the risk of insuring the life of the deceased, Glinda Ann Dinkins.

"An insurer has the right to know all that an applicant knows regarding the state of the proposed insureds' health and medical history.

"Material misrepresentation *and/or* [italics added] concealment of such facts are grounds for cancellation of the policy and an actual intent to deceive need not be shown.

"Materiality is determined solely by the probable and reasonable effect which truthful answers would have had on the insurer in forming its estimate of the disadvantages of the proposed contract or in making its inquiries.

"The fact that the insurer has demanded answers to specific questions in an application for insurance is, in itself, usually sufficient to establish materiality as a matter of law.

"However, if an applicant for insurance had no present knowledge of the facts sought or failed to appreciate the significance of information

related to him, his incorrect or incomplete responses would not constitute grounds for cancellation of the policy.

"Moreover, questions concerning illnesses or disease do not relate to minor indispositions but are to be construed as relating to serious ailments which undermine the general health.

"An applicant for insurance, except in answer to the questions of the insurance company, is not bound to communicate information which the insurance company knows or information which, in the exercise of ordinary care, the insurance company ought to know and of which the applicant has no reason to suspect the insurance company of being ignorant.

"The right to information of material facts may be waived by the insurance company by its neglect in making inquiries as to such facts where they are distinctly implied in other facts of which information is communicated.

"If such distinct implication does not exist, there will be no waiver by the insurer in not making further inquiry. A waiver of a misstatement also occurs if an insurer had at its disposal the source from which it could obtain the material information which it later claimed was withheld from it and it made no investigation before issuing the policy.

"Since the *misrepresentation* [italics added] must be a material one, an incorrect answer on an insurance application does not allow cancellation of the policy by the insurer where the true facts, if known, would not have made the contract less desirable to the insurer.

"You are not required to believe either the postmortem testimony of the insurance company's employees that insurance would have been refused had the true facts been disclosed, or the postmortem testimony of the party seeking recovery.

"The fact that death resulted from a cause unrelated to a *material misrepresentation* [italics added] has no effect on the right of the insurance company to cancel the policy.

"If you find that defendant American National Insurance Company improperly cancelled the policy, it is liable for $1,000 to the plaintiff George R. Dinkins.

"If, and only if, you determine that there was improper cancellation of the policy, you may then consider whether defendant American National Insurance Company acted unreasonably and in bad faith in withholding payment of the claim.

"In every insurance contract there is an implied covenant of good faith and fair dealing. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of the insured, it is not liable not only for the amount of the policy, but for pecuniary loss and, if such existed, also for the consequential emotional and mental distress suffered by the insured.

"With respect to this issue, plaintiff has the burden of proof by a preponderance of the evidence as contrasted to the issue of *material misrepresentation* [italics added] where the burden of proof must be carried by the defendant insurance company."

Comparison of the court's instruction with those proposed by defendant and with the authorities which support defendant's proposed instructions discloses that the court virtually omitted from the case the issue of *concealment* on the part of plaintiff. Instead, the court's instruction—read in its entirety—placed upon defendant the burden to prove an *affirmative misrepresentation* by plaintiff. ■ The law, on the other hand, permits rescission of an insurance contract where the insured has simply negligently or inadvertently failed to reveal certain facts which, if known to the insurer, would have caused it to refuse to issue the policy in question. (See, e.g., Deering's Ann. Ins. Code (1976 ed.) §§ 331, 359, and cases cited therein.)

The reference in the fifth paragraph of the court's instruction to "material misrepresentation and/or concealment" does not cure the error of which defendant complains. The use of "and/or" gives rise to multiple meanings; specifically, it can mean either or it can mean both. (*Powers Farms* v. *Consolidated Irr. Dist.* (1941) 19 Cal.2d 123, 128 [119 P.2d 717]; Webster's Third New Internat. Dict. (1969) p. 80.) ■ Misrepresentation and concealment are not synonymous. If they were, there would be no reason for the Legislature to treat them separately. (See *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 111-112 [65 Cal.Rptr. 315, 436 P.2d 315]; *Disabled & Blind Action Committee of Cal.* v. *Jenkins* (1974) 44 Cal.App.3d 74, 79 [118 Cal.Rptr. 536].) In Insurance Code sections 330 through 339, the Legislature deals with concealment as intentional, unintentional, or merely negligent—each type of conceal-

ment having a different effect. In sections 350 through 361 of that code, the Legislature deals separately with representations and the effect of their falsity upon a party's right to rescind.

Moreover, California courts have consistently treated misrepresentation and concealment as distinct alternative defenses in the context of insurance coverage. (See *Thompson* v. *Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 916 [109 Cal.Rptr. 473, 513 P.2d 353]; *Telford* v. *New Life Ins. Co.* (1937) 9 Cal.2d 103, 105 [69 P.2d 835].) In the case at bench, the court's failure to relate to the jury the possible alternate bases for defendant's refusal to pay under the contract was compounded by several of the instructions given on plaintiff's theory asserting fraud on the part of defendant.[3] Nowhere in the instructions were the terms misrepresentation and concealment defined for the jury in a manner which would have aided its understanding of the distinction given these terms in the Insurance Code.

The next impact of the court-created instruction was to raise defendant's burden of proof from that of merely establishing to the jury's satisfaction that plaintiff failed to disclose an indisputedly material fact (that his daughter Glinda Ann had been seen and treated in the emergency room of Sacramento Medical Center just a short time before the policy application was completed) to a requirement that defendant establish an affirmative act of misrepresentation by plaintiff. The record is uncontradicted that plaintiff was aware that Glinda Ann's undiagnosed condition required her to be taken to the hospital emergency room in the middle of the night and that he did not disclose those events to defendant's representatives. The most that can be said of plaintiff's testimony is that he *may* have told defendant's agents that Glinda had given birth to two children, provided they had asked him any questions about her. On the state of the record before us, and reviewing the evidence in light of the relevant factors to be considered (see *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946]) we hold that the trial court's omnibus instruction, minimizing almost to the point of omission the issue of possible concealment by plaintiff—an alternative justification for defend-

---

[3] These instructions, which referred in two instances to the false representations necessary to prove a case of fraud, may very well have had the effect of misleading the jury as to defendant's burden of proof. "Whether 'the probable effect of the instruction has been to mislead the jury . . . depends on all the circumstances of the case, including the evidence and the other instructions given.' " (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946] [quoting from *Butigan* v. *Yellow Cab Co.* (1958) 49 Cal.2d 652 at pp. 660-661 (320 P.2d 500)].)

ant's refusal to pay—was necessarily prejudicial in that it put defendant to a burden of proof greater than that imposed by law.[4]

For the purpose of providing guidance to the court on retrial, we review defendant's claim that the court erred in awarding attorney fees with respect to that part of the judgment granting plaintiff contractual relief under the policy and damages for emotional distress. The parties had stipulated at trial that the question whether attorney fees were to be awarded, and if so, the amount thereof, would be decided by the trial court, not the jury. The court determined the issue in plaintiff's favor, held that $4,500 would be an appropriate fee for plaintiff's attorneys, and subtracted from that an amount which it allocated to the recovery of punitive damages, reaching a final figure of $2,750 to be paid by defendant for plaintiff's attorney fees.

Those bad faith cases which touch upon an insured's right to attorney fees compel the conclusion that fees were improperly awarded with respect to legal services attributable to any portion of plaintiff's recovery which exceeded the amount due under the policy.

The only California case relied on in support of the award is *Mustachio v. Ohio Farmers Ins. Co.* (1975) 44 Cal.App.3d 358 [118 Cal.Rptr. 581]. *Mustachio* was an action brought by an insured against his insurer seeking both general and punitive damages, and alleging bad faith by the insurer which resulted in emotional distress. (*Id.,* at p. 362.) The insured there had suffered a fire loss and was told by his insurer that if he did not accept its first settlement offer it would retire his claim without payment. As a result he was forced to retain counsel to compel the insurer to make payment, in a more appropriate amount, under the policy. It is quite clear from the opinion in *Mustachio* that the only attorney fees to which the insured was entitled were those relating to recovery of the fire loss, not those incurred in connection with the action for emotional distress. (*Id.,* at p. 362, fn. 4; to same effect, see *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 920 [148 Cal.Rptr. 389, 582 P.2d 980]; *Twentieth Century-Fox Film Corp.* v. *Harbor Ins. Co.* (1978) 85 Cal.App.3d 105, 112-115 [149 Cal.Rptr. 313].) This limitation is consistent with the general

[4]In its "burden of proof" instruction, as well as in the omnibus instruction, the court again instructed the jury that the burden of proof was on defendant to establish by a preponderance of the evidence all of the facts necessary to prove that plaintiff made a *material misrepresentation*, without reference to the issue of concealment.

rationale of bad faith cases. (See, e.g., *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 434 [58 Cal.Rptr. 13, 426 P.2d 173]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574-575 [108 Cal.Rptr. 480, 510 P.2d 1032].)

The judgment is reversed.

Puglia, P. J., and Evans, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 24, 1979. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.