[Civ. No. 21540. Third Dist. Jan. 9, 1984.]

DORIS B. MOORE, Plaintiff and Respondent, v.
AMERICAN UNITED LIFE INSURANCE COMPANY,
Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*See *post,* page 616.

614

COUNSEL

Long & Levit, John B. Hook, Marsha L. Morrow, Betty C. Bullock, Rogers, Joseph, O'Donnell & Quinn, Joseph W. Rogers, Jr., and Nance F. Becker for Defendant and Appellant.

Crosby, Heafey, Roach & May, Peter W. Davis and James C. Martin as Amici Curiae on behalf of Defendant and Appellant.

Panattoni, Westley, Farrell & Fraulob and Thomas C. Westley for Plaintiff and Respondent.

OPINION

**SIMS, J.**—Plaintiff, Doris B. Moore, sued defendant American United Life Insurance Company (AUL) for breach of a contract to provide disability

benefits and "bad faith" denial of benefits. After 40 days of trial, a jury awarded plaintiff $30,000 compensatory damages and $2.5 million punitive damages.[1] Pursuant to a stipulation that "the issue" of damages in the form of attorney fees would be tried to the court without a jury, the court awarded plaintiff an additional $843,333.33. Defendant appeals.

In this published portion of our opinion (see Cal. Rules of Court, rule 976.1), we address issues related to evidentiary rulings, instructions, punitive damages, and whether attorney's fees are recoverable where the contract contains no attorney's fees clause. We affirm that portion of the judgment awarding plaintiff damages. However, we conclude attorney's fees are not recoverable and reverse that award. To the extent our prior opinion in *Dinkins* v. *American National Ins. Co.* (1979) 92 Cal.App.3d 222 [154 Cal.Rptr. 775] suggests attorney's fees are properly recoverable, we disapprove it.

In an unpublished portion of this opinion we address defendant's remaining contentions that do not meet criteria for publication. (See Cal. Rules of Court, rule 976(b).)

FACTS

A. ■ ■■■■ *Facts related to plaintiff's disability and claim.*[2]

Plaintiff was born in 1932 in Cloudcroft, New Mexico. Plaintiff's mother died when she was two years old and she was raised by her aunt. From age five plaintiff kept house and cooked meals for her brothers and sisters who worked out of the home. Plaintiff attended school through the eighth grade. She received no other formal education.

Eventually plaintiff migrated to California and for 10 years was employed as a food waitress at a restaurant in North Sacramento. Throughout her entire working life, plaintiff had three other jobs. She held a seasonal part-time job at Hunt's Cannery sorting tomatoes for a few months, assisted in the operation of a lathe in the making of pistons for aircraft at McClellan Air Force Base, and, for six years immediately preceding July 12, 1975, drove a school bus. For the last three years prior to July 12, 1975, plaintiff worked for North Sacramento School District as a school bus driver (as a 12-month, full-time, permanent employee) driving elementary school students to and from school and performing certain maintenance and custodial chores.

---

[1] Another defendant, Kaiser-Permanente, received a defense verdict.

[2] We must view the evidence in the light most favorable to plaintiff, who prevailed. (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 511 [189 Cal.Rptr. 377, 658 P.2d 740].)

Defendant issued a group life insurance policy to the North Sacramento School District containing an instalment disability benefit provision. This disability option provided that, in lieu of death benefits, the amount of the life insurance would be paid in 60 monthly instalments if the employee became "totally and permanently disabled" while insured under the policy. The term "total disability" was defined in the policy as a disability resulting from bodily injury or disease which wholly prevented the employee "from engaging in any occupation or employment for compensation, profit, or gain." Total disability was considered to be "permanent" under the policy if it was "reasonably certain that such disability will continue during the remaining lifetime of the Employee." There was also a presumption in the policy that, for purposes of commencing benefit payments, any total disability which existed for a continuous period of nine months was permanent. The policy contained no clause awarding attorney's fees to either insurer or insured in the event of litigation arising out of the policy.

Defendant's group life insurance policy with instalment disability benefits terminated on September 1, 1975, and was succeeded by a group policy, issued by a different insurer, that did not include a disability benefit provision.

In early July 1975, plaintiff went to the emergency room at Kaiser Hospital complaining of chest pains. On July 12, 1975, she was diagnosed as having had a myocardial infarction and was admitted to the hospital. She was discharged on July 29 and returned periodically to be examined and treated on an out-patient basis.

Shortly thereafter plaintiff requested information pertaining to the filing of a claim for disability benefits with defendant. Defendant told plaintiff in the letter enclosing the claims form that the "provisions of the Installment Disability Benefits are contained in your Certificate of Insurance." The certificate of insurance contained the definition of total disability quoted above.

On September 3, 1975, plaintiff filled out a form provided by defendant claiming instalment disability benefits. On that form plaintiff stated that she had had a heart attack on July 8, 1975, and that she had been prevented from working since July 11, 1975.

The form also contained a section (Attending Physician's Statement) to be filled out by plaintiff's attending physician. The Attending Physician's Statement section of the form asked the treating doctor, among other things, to give an opinion as to whether or not the insured was "totally disabled." Nowhere in the form was "total disability" defined or the criteria to be used in such a determination given. The form also asked the treating doctor to

render an opinion as to whether or not the insured was "totally disabled" for "any occupation" or for his "regular occupation." Additionally, the form asked a physician who had answered "yes" to the question of whether or not the patient was totally disabled to render a further opinion as to when the physician thought the "patient will be able to resume to any work."

On October 1, 1975, Dr. Ralph Swerdlow, one of plaintiff's treating physicians at Kaiser, completed the Attending Physician's Statement so as to indicate that Mrs. Moore, in his opinion, was then totally disabled from any work but might be able to resume working on November 15, 1975.

On October 28, 1975, defendant's claims examiner, Jo Lynn Short, sent a letter to Dr. Swerdlow asking for clarification of his opinion regarding plaintiff's ability to return to work. This letter indicated, "Ms. Moore must be totally disabled, 'resulting from bodily injury or disease which wholly prevents the employee from engaging in *any* occupation or employment for compensation, profit, or gain. Total disability during its continuance shall be presumed to be permanent if it continues during the remaining lifetime of the employee.'" (Italics added.) The letter continued: "According to the claim form which was completed by you, under the Attending Physician's statement, you have indicated that Ms. Moore may resume work on November 15, 1975. Therefore, according to the above definition, do you believe Ms. Moore to be totally disabled?" A copy of the letter was sent to plaintiff.

The definition of total disability provided to Dr. Swerdlow by the claims examiner's letter was taken directly from defendant's policy. The policy language misstated California law as it has existed since 1942. ▮ When coverage provisions in general disability policies require total inability to perform "any occupation," the courts have assigned a common sense interpretation to the term "total disability" so that total disability for purposes of coverage results whenever the employee is prevented from working "with reasonable continuity in his customary occupation or in any other occupation in which he might reasonably be expected to engage in view of his station and physical and mental capacity." (*Erreca* v. *West. States Life Ins. Co.* (1942) 19 Cal.2d 388, 394-395 [121 P.2d 689, 141 A.L.R. 68].)

On January 13, 1976, Dr. Swerdlow responded to defendant's letter by stating plaintiff was not totally disabled at that time. He noted, however, that her bus driver's license had been revoked by the Department of Motor Vehicles due to her physical condition so that she could no longer work as a bus driver.

Without further investigation, defendant denied plaintiff's claim for installment disability benefits.

On February 2, 1976, claims examiner Short wrote to plaintiff stating defendant was unable to approve her claim because Dr. Swerdlow, plaintiff's treating physician, had concluded plaintiff was not totally disabled. The letter again included the restrictive and legally incorrect policy definition of total disability. Plaintiff was invited to contact the claims department if she had any questions.

Beginning in May 1976, plaintiff's medical condition began to deteriorate. In late May and early June 1976, plaintiff suffered an unidentified medical event characterized by chest pain, amnesia and disorientation. In July 1976, Dr. Alfredo Burlando performed three separate stress tests upon plaintiff. During those tests plaintiff demonstrated a very low level of functional performance. She complained of chest pains during the treadmill test. Because this pain was not relieved by nitroglycerin or by reducing workload, Dr. Burlando concluded it was in part psychosomatic.

In November 1976, plaintiff underwent a double bypass operation but showed no improvement following that operation. In January 1977, Dr. Burlando concluded plaintiff was totally and permanently disabled.

In February 1977, Dr. Burlando advised the Public Employee's Retirement System that plaintiff "is now permanently and totally disabled." He based this conclusion of permanent disability on the fact that plaintiff had not responded to any intervening treatment including the bypass operation.

In June 1977, plaintiff had a second confirmed myocardial infarction.

In late August 1977, plaintiff came into the Kaiser emergency room complaining of right-sided weakness. In October 1977, she suffered her first probable stroke. Between that date and March 1978, she returned to the hospital on several occasions complaining of weakness in her right arm and leg, confusion, forgetfulness, and general tiredness.

In May 1978, plaintiff suffered a major brain stem infarction. As a consequence of that stroke, plaintiff has suffered severe neurological problems manifesting themselves both physically and mentally. She has developed a weakness in the right arm and hand as well as in the right leg. She suffers from isolated nerve palsies which create difficulty moving her right eye beyond midline. She also has difficulty with speech, slurring words and drooling slightly. She has a juvenile mentality and has spontaneous episodes of crying and emotion.

B. *Facts related to defendant's deceptive claims policies and practices.*

Relying primarily on testimony of defendant's manager of group claims, Duane Whipple, plaintiff presented evidence that at or about the time plain-

tiff's claim was reviewed and denied, defendant used the following practices and procedures in its review of disability claims:

1. As part of his or her initial claims documentation, an insured was required to submit to defendant an Attending Physician Statement, to be completed by a physician who had treated the insured for the claimed disability. The Attending Physician Statement asked the physician to state whether the insured was then "totally disabled" alternatively "for any occupation" or "for his regular occupation." No definition of "total disability" accompanied the Attending Physician Statement.

2. In the event the insured's physician indicated the insured was not totally disabled, the claim would be denied without further investigation.

3. In the event the insured's physician indicated the insured was not disabled "for any occupation" but was disabled "for his regular occupation," the claim would be denied without further investigation.

4. Defendant knew that the opinions of attending physicians, as reflected in the Attending Physician Statements, were unreliable,[3] because attending physicians had widely differing views of "total disability."

5. If the insured's physician indicated in the Attending Physician Statement that the insured was totally disabled for both regular occupation and for any occupation, defendant would send the treating physician a letter setting forth the policy definition of "total disability" and asking the physician to reevaluate his or her opinion of "total disability" in light of the definition in the policy, i.e., that a disability must prevent the insured "from engaging in *any* occupation or employment for compensation, profit, or gain." The physician was not informed that the policy definition misstated California law (see *Erreca* v. *West. States Life Ins. Co., supra*, 19 Cal.3d 388) and was therefore unlawfully restrictive.

6. In the event the insured's physician responded to the aforementioned letter indicating the insured was not totally disabled according to the policy definition, the claim would be denied without further investigation.

---

[3]Defendant's own claims manual contained the following instructions to claims adjusters with respect to their appropriate response to an attending physician who stated his or her patient *was* totally disabled:

"It is not the intent of this writing to cast dispersion upon the verification of total disability by the attending physician on the claim form or in his written comments, but the claim adjuster should take into consideration the following reasons why physical examination by another doctor may be called for.

"1. *What is the doctor's definition of total disability? Total disability may be defined by various doctors as ranging from a slight partial disability to requiring complete bed confinement. . . .*" (Italics added.)

7. When defendant would deny a claim, it would send the insured a letter setting forth the policy's definition of "total disability," although that definition misstated California law.

8. Defendant did not investigate the work experience, education, or social history of an insured before denying a disability claim.

9. Even though defendant's manager of group claims knew, prior to denial of plaintiff's claim, that the definition of "total disability" in its policy did not accurately reflect California law, defendant had made no changes in its claims review procedures even as of the time of trial.

### C. *Facts related to other claims.*

In further support of her contention that defendant used deceptive and misleading claims review procedures, plaintiff introduced evidence of two other disability claims presented to defendant. Specifically, certain correspondence relating to the insurance claim of Burley Lewis was admitted for the limited purpose of showing that, before the denial of plaintiff's insurance claim by defendant, it had been informed of California's legal definition of total disability. In addition, plaintiff introduced evidence in connection with an action filed by Clayton Anderson against defendant for the limited purpose of showing that certain deceptive claims handling practices of defendant had been employed in both the Anderson case and plaintiff's case and, also, that defendant knew its definition of "total disability" was at variance with California law when it denied plaintiff's claim.[4] These claims are briefly described below.

### 1. *Burley Lewis Claim*

Burley Lewis was a former coworker of Doris Moore at the North Sacramento School District. In 1974 he submitted a disability claim to defendant arising out of a back injury. The claim was initially denied by defendant

---

[4]The court instructed the jury regarding the Anderson claim as follows: "You have received certain evidence in connection with an action filed by Clayton Anderson against AUL. This evidence was admitted for the limited purpose of showing certain claims handling practices of AUL and an attorney's interpretation of California law. You must consider this evidence for this limited purpose only and not for the purpose of determining whether or not Clayton—Clayton—the Clayton Anderson claim had merit." The court instructed the jury similarly regarding the Lewis claim: "You have received evidence in this case consisting of correspondence relating to the insurance claim of Burley Lewis. This evidence was admitted for the limited purpose of showing that before the denial of the insurance claim of Doris Moore, Defendant AUL had been informed of a legal interpretation to be applied in California to total disability claims. You must consider this evidence for this limited purpose only and not for the purpose of determining whether or not the Burley Lewis claim had merit."

based upon Lewis' Attending Physician's Statement indicating Lewis was not totally disabled for "any occupation," although he was unable to continue in his regular occupation.[5]

Lewis sought the assistance of Attorney Thomas Westley, counsel for plaintiff in the instant action, to obtain disability benefits. In response to an initial inquiry by Westley the supervisor of defendant's group claims department advised that Lewis did not qualify for benefits because he was not totally disabled as defined by the policy; that is, he was not prevented from engaging in "any occupation or employment for compensation, profit, or gain."

By letter dated October 4, 1974, Westley objected that the questionnaire submitted to the treating physician did not accurately reflect California's interpretation of the term "total disability" in general disability policies:

"Under this legal definition of total disability in California, you will note, that the individual can be wholly prevented from engaging in any occupation or employment for compensation, profit or gain if he is prevented from carrying on his usual activity if in fact he is not trained to do anything other than his normal or usual occupation.

". . . . . . . . . . . . . . . . . . . . . . .

"As you well know, factors such as my client's age, experience, intelligence, training, as well as many added factors, go into the determination of whether or not he is totally disabled."

### 2. Clayton Anderson Claim

Clayton Anderson was a former elementary school teacher for the Oakland Unified School District. Anderson's action against defendant arose out of his claim for long-term disability benefits under a group long-term disability policy issued to his former employer.

The Anderson policy differed slightly from the Moore policy. Unlike the Moore policy, the Anderson policy provided disability coverage for the first 24 months of a disability if the insured was unable to engage in "his regular occupation." After the first 24 months, the policy provided general disability coverage if the insured was completely unable "to perform any and every duty of any gainful occupation for which he is reasonably fitted by

---

[5]The Attending Physician's Statement was contained in a form identical to that submitted by plaintiff's physician.

training, education or experience." In contrast, the Moore policy defined "total disability" as one which prevented the insured from "engaging in any occupation for compensation, profit, or gain." The Anderson policy also differed from the Moore policy in that the Anderson policy did not require that the disability be permanent.

Anderson had been employed as an elementary school teacher for over 13 years prior to his initial claim for disability benefits under this policy. In 1971, he lost his hearing. Both his treating physician and an independent medical examiner retained by defendant to examine Anderson advised defendant that his hearing loss made it virtually impossible for Anderson to continue to function as an elementary school teacher. The independent medical examiner, Dr. Irving, noted, however, that Anderson could retrain for other employment. Based upon these opinions defendant commenced payment of benefits pursuant to the occupational disability provision in his policy.

In September 1972, approximately 6 months prior to expiration of the initial 24-month period of disability, defendant requested Anderson to provide supplemental information concerning his disability. In October 1972 and again in March 1973 Anderson's treating physician advised that Anderson's loss of hearing rendered him permanently disabled from any occupation.

In April 1973, defendant arranged for Dr. Irving to examine Anderson again. Defendant advised Dr. Irving by letter of the policy definition for total disability after two years: "Complete inability of the insured employee to perform any and every duty of *any* gainful occupation for which he is reasonably fitted by training, education or experience." (Original italics.)

On May 8, 1973, Dr. Irving reported that Anderson's condition was unchanged from 1971. Although Dr. Irving agreed with Anderson's treating physician that Anderson could not teach elementary school, he disagreed that Anderson was totally disabled within the policy definition provided to him. Dr. Irving wrote, "[T]here are a vast number of jobs in the world which he could perform quite well."

On May 30, 1973, defendant advised Anderson of its decision to terminate his benefits based upon Dr. Irving's conclusion that he did not come within the policy definition of total disability.

On July 20, 1973, Attorney Harry Ducey, representing Anderson, wrote to manager of group claims, Duane Whipple, in Indianapolis, Indiana. The letter stated Ducey's contention that Anderson qualified for disability ben-

efits because "his hearing condition makes it impossible for him to perform any gainful occupation for which he is reasonably fitted by reason of his training, education, experience or station in life." Shortly thereafter, Ducey telephoned Whipple and told him the letter reflected Ducey's interpretation of California law as applied to disability insurance policies.

In response, defendant reaffirmed its decision to terminate Anderson unless additional medical evidence was submitted indicating Anderson was not employable. Ducey then filed a complaint against defendant for recovery of policy benefits.

On November 18, 1975, Ducey took Whipple's deposition in the Anderson case. Ducey told Whipple at the deposition that Ducey's definition of total disability was "a direct quotation from the [California] Supreme Court."

Despite Whipple's knowledge of applicable California law acquired during the Lewis and Anderson cases, defendant's incorrect definition of "total disability" and its claims procedures remained unchanged.

DISCUSSION

I

*Evidentiary Rulings*

Defendant argues that a number of the trial court's rulings on the admission and exclusion of evidence prejudiced its defense.

A

■ Defendant contends the court erred in admitting evidence of the Anderson claim because it was irrelevant to any disputed issue of fact. (Evid. Code, § 210.) Plaintiff contends the Anderson evidence was properly admitted because it was relevant to establishing a pattern or practice of unreasonable (indeed fraudulent) behavior in the review of insureds' claims. We agree.

In *Colonial Life & Accident Ins. Co. v. Superior Court* (1982) 31 Cal.3d 785 [183 Cal.Rptr. 810, 647 P.2d 86], the California Supreme Court recently had occasion to determine whether a plaintiff could properly discover the names, addresses and records of certain claimants of an insurance company in an action alleging, inter alia, bad faith on the part of one of its agents. The court concluded plaintiff could, holding: "Indirect evidence of

the elements of punitive damages may be suggested by a pattern of unfair practices. In [*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 (148 Cal.Rptr. 389, 582 P.2d 980)], for example, we affirmed an award of punitive damages based on a failure to settle where the evidence indicated that defendant insurance company's refusal 'to accept [plaintiff's] offer of settlement, and its subsequent submission of the matter to its attorney for opinion, [fn. omitted] were all part of a conscious course of conduct, firmly grounded in established company policy . . . .' (At p. 923.) Similarly, in *Delos* v. *Farmers Insurance Group* (1979) 93 Cal.App.3d 642, 664 [155 Cal.Rptr. 843], hearing denied August 29, 1979, the court upheld an award of punitive damages based in part on 'an inextricable involvement with conduct aptly described . . . as a "nefarious scheme to mislead and defraud thousands of policyholders" with defendants' decision to deny [plaintiff's] claim.' (See also *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 352-353 [87 Cal.Rptr. 226].) [¶] Without doubt, the discovery of the names, addresses and files of other Colonial claimants with whom [plaintiff] attempted settlements is relevant to the subject matter of this action and may lead to admissible evidence." (*Id.*, at p. 792; fns. omitted; see *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 104 [178 Cal.Rptr. 831]; *Pistorius* v. *Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 557 [176 Cal.Rptr. 660].)

Defendant, citing *Hercules etc. Co.* v. *Automatic etc. Corp.* (1957) 151 Cal.App.2d 387 [311 P.2d 907], argues the Anderson claim was irrelevant because of significant factual dissimilarity. In *Hercules* the court approved the trial court's exclusion of certain testimony intended to establish industry custom or practice in a negligence action. The court noted, "In order to be relevant, the conditions must be the same or similar [citations]." (P. 400.)

*Hercules* is obviously not entirely on point. Nevertheless we agree with defendant that in order to establish "a pattern of unfair claims practices" the antecedent practice must be substantially similar.

Here, defendant contends the Anderson claim was dissimilar to plaintiff's because a different insuring clause was used in the two policies. "Total disability" under plaintiff's policy was defined as a disability that prevented the insured from "engaging in any occupation for compensation, profit, or gain." Under the Anderson policy, total disability was defined as the complete inability of the insured "to perform any and every duty of any gainful occupation for which he is reasonably fitted by training, education, or experience." This difference, however, is immaterial to the purpose for which the evidence was offered.

The Anderson claim evidence was offered in part to show that defendant routinely pursued a practice of obtaining misleading opinions from physi-

cians by sending them a definition of "total disability" lifted verbatim from the applicable policy and without informing them that the legal definition of "total disability" under California law was different from and broader than the policy definition. The evidence was also offered to show that defendant also routinely sent misleading policy language to its insureds.

The applicable insuring clause in the Anderson policy, like the insuring clause in plaintiff's policy, was a nonoccupational, general disability clause subject to the definition of "total disability" set forth in *Erreca v. West. States Life Ins. Co., supra,* 19 Cal.2d at pages 395-396.[6] (*McMackin v. Great American Reserve Ins. Co.* (1971) 22 Cal.App.3d 428, 432, 437 [99 Cal.Rptr. 227]; see *Austero v. National Cas. Co.* (1978) 84 Cal.App.3d 1, 19-20 [148 Cal.Rptr. 653]; disapproved on other grounds in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 824, fn. 7 [169 Cal.Rptr. 691, 620 P.2d 141]; see generally Annot. Insurance: "Total Disability" or the Like as Referring to Inability to Work in Usual Occupation or in Other Occupations (1968) 21 A.L.R.3d 1155.) Since both plaintiff's and Anderson's disability policies were subject to the same definitional legal standard, the policies were substantially similar.

It is also clear that, read literally, the applicable insuring clause in the Anderson policy failed miserably to meet the *Erreca* test.[7] The policy did not require the insurer to consider the insured's physical capacity, nor whether the insured could work "with reasonable continuity," nor whether the insured could *"reasonably* be expected" to engage in an occupation. Moreover, an insured was totally disabled under a literal reading of the Anderson policy only if the insured was completely unable to perform *every* duty of an occupation for which the insured was reasonably fitted by training, education, and experience. The policy language thus permits the conclusion that an insured is not "totally disabled" if he or she can perform one, or some, of the duties of the insured's regular occupation. Thus, for example, an insured who worked as a printer, and who was required both to read copy and to manually set print, would not be totally disabled, even if confined in an iron lung, provided the insured could still read the copy. That result is not what *Erreca* intended. " 'Recovery is not precluded under a total disability provision because the insured is able to perform sporadic

---

[6] In the instant case, the jury was so instructed.

[7] Once again, by that test, total disability prevents the insured from " 'working with reasonable continuity in his customary occupation or any other occupation in which he might reasonably be expected to engage in view of his station and physical and mental capacity.' " (*Erreca v. West. States Life Ins. Co., supra,* 19 Cal.2d at pp. 394-395, quoting *Hurwit v. Prudential Is. Co. of America* (1941) 45 Cal.App.2d 74, 81 [113 P.2d 691].) "Total disability" was defined in Anderson's policy as "Complete inability of the insured employee to perform any and every duty of any gainful occupation for which he is reasonably fitted by training, education, or experience."

tasks, or give attention to simple or unconsequential details incident to the conduct of business.' " (*Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 887 [103 Cal.Rptr. 865, 500 P.2d 889], quoting *Erreca* v. *West. States Life Ins. Co., supra,* 19 Cal.2d at p. 396.)

At the time the court ruled on plaintiff's motion to admit the Anderson claim evidence, the jury had properly heard testimony from defendant's manager of group claims, Whipple, indicating the company had a policy of sending physicians and insureds the policy definition, but not the legal definition, of "total disability." The Anderson claim evidence tended to show that, in practice, defendant actually used the abstract claims review procedures that Whipple testified about.

We recognize "the principles that except as otherwise provided by statute 'all relevant evidence is admissible' (Evid. Code, § 351); that 'relevant evidence' is all evidence 'including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' (*id.,* § 210); and that the trial court is vested with wide discretion in determining relevance under this standard (*People* v. *Warner* (1969) 270 Cal.App.2d 900, 908 [76 Cal.Rptr. 160], and cases cited)." (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) We agree with the trial court that evidence of the Anderson claim was properly admitted, in the words of the trial court's instruction, "for the limited purpose of showing certain claims handling practices" of defendant. (See fn. 4, *ante.*)

Plaintiff also contends the Anderson evidence tended to prove defendant knew its claims practices were misleading, because Anderson's attorney advised defendant's manager of group claims of the correct definition of total disability as enunciated by the California Supreme Court in *Erreca.* Again we agree.

At his deposition Whipple testified he had no knowledge of the correct definition until 1977, sometime after plaintiff's claim was denied. A part of the Anderson evidence included a letter, a phone call, and a deposition reflecting that Whipple was advised of the *Erreca* definition of total disability before November 1975.[8]

Defendant also argues that, assuming evidence of the Anderson claim had any probative value, it was substantially outweighed by the danger of undue

---

[8]Defendant argues the letter Anderson's attorney wrote was lacking in the specificity necessary to accomplish the mission assigned by plaintiff. That argument was and is more properly addressed to the jury.

prejudice. (Evid. Code, § 352.) ■ However, as we have noted, absent a clear showing of abuse, we are compelled to uphold the trial court's exercise of discretion under section 352. (*People* v. *Shoemaker* (1982) 135 Cal.App.3d 442, 449 [135 Cal.Rptr. 442, 185 Cal.Rptr. 370].) ■ Here, the trial court expressly found that the evidence was relevant to the issue of whether defendant engaged in unreasonable practices in denying disability claims and that it presented insignificant prejudice to defendant. The court gave appropriate limiting instructions with respect to the purposes for which the evidence was admitted. (See fn. 4, *ante.*) We cannot conclude the trial court abused its discretion.

**B**

■ Defendant contends the court erred in admitting former testimony[9] given by plaintiff before an administrative judge in a Workers' Compensation Appeals Board proceeding at which plaintiff's temporary disability was determined. (Evid. Code, § 1292.)[10] ■ Defendant was not a party to the workers' compensation proceeding but apparently recognizes the rule that, "Under Evidence Code section 1292, former testimony of a witness may in certain circumstances be received against a person not a party to the proceeding in which the former testimony was given; section 1292 constitutes a specific exception to the hearsay rule." (*Pena* v. *Toney* (1979) 98 Cal.App.3d 534, 540 [160 Cal.Rptr. 4].) ■ However, defendant argues that the issues litigated in the prior proceeding were confined to whether plaintiff's disability arose out of employment and not whether she was actually disabled. (Evid. Code, § 1292, subd. (a)(3).) Consequently, defendant contends no party to the workers' compensation proceeding had an

---

[9]Defendant argues that the following portion of the transcript wherein plaintiff was questioned by her attorney in that proceeding demonstrates the prejudice to its defense:

"Q: Did the school district offer your janitorial job back?
"A: I am a bus driver. They couldn't offer me a janitorial job.
"Q: But—
"A: They offered the job of teacher's aide.
"Q: Were you going to take it when you get better?
"A: I don't know. Right now I—I know I couldn't do it, teacher's aide. It's a very easy job but it's very mentally hard, you know."

Defendant argues that plaintiff's testimony "superficially suggests that the job of a teacher's aide was beyond her mental capacity" within the meaning of the *Erreca* definition of disability.

[10]Subdivision (a) of Evidence Code section 1292 provides:

"(a) Evidence of former testimony is not made inadmissible by the hearsay rule if:
"(1) The declarant is unavailable as a witness;
"(2) The former testimony is offered in a civil action; and
"(3) The issue is such that the party to the action or proceeding in which the former testimony was given had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party against whom the testimony is offered has at the hearing."

interest or motive to cross-examine Mrs. Moore on the issue of the *extent* of her disability.

Defendant's characterization of the scope and purpose of the workers' compensation hearing is too narrow. The hearing was not simply for the purpose of determining whether plaintiff's disability occurred in the scope of her employment, as defendant argues. ■ Rather, as a matter of law, the scope of the hearing included issues with respect to (a) whether plaintiff was unable to work, since an employee must show an inability to work in order to claim a "disability," (*Herrera* v. *Workmen's Comp. App. Bd.* (1969) 71 Cal.2d 254, 257 [78 Cal.Rptr. 497, 455 P.2d 425]), and (b) whether plaintiff was temporarily *totally* disabled, on the one hand, or temporarily *partially* disabled, on the other. (See Lab. Code, §§ 4653, 4654; *Herrera* v. *Workmen's Comp. App. Bd., supra,* 71 Cal.2d at p. 257.) "An employee is considered temporarily *partially* disabled if he is able to earn some income during his healing period but not his full wages." (*Herrera, supra,* at p. 257, italics in original.) ■ Consequently, as a matter of law, there was an interest and motive on the part of the workers' compensation judge to inquire into plaintiff's claims she could not earn income, including possible income as a teacher's aide.

In fact, the transcript of the workers' compensation hearing indicates the judge inquired extensively into plaintiff's ability to work. The judge asked plaintiff, for example, how often she was seeing her doctors, whether plaintiff required a special license to drive a school bus, and whether plaintiff's treating physicians were of the opinion she could return to work.

Before ruling on defendant's objection to the admissibility of the workers' compensation testimony, the trial judge reviewed the transcript and carefully weighed defendant's objection based on unfair lack of cross-examination. The trial court concluded: "I think these—this testimony was subject to cross-examination. It has more reliability than most of the testimony that comes in under hearsay rule exceptions. [¶] I would think that there was a significant motive to cross examine on these points. . . ." We agree. The court did not err in admitting plaintiff's prior testimony under Evidence Code section 1292.

## C

■ Defendant contends the court erred in permitting expert testimony concerning the attitudes and practices of employers in the current job market.

Defendant offered the expert testimony of a vocational rehabilitation counselor that there were a number of jobs plaintiff could do within a set of

physical and mental parameters supplied by counsel under defendant's view of the evidence.

Similarly, plaintiff offered the expert testimony of a rehabilitation counselor. Plaintiff's witness provided testimony similar to defendant's but evoked the opposite conclusion—that defendant was precluded from finding and holding a job because of her physical disability. In reaching this conclusion, plaintiff's expert considered a number of factors. Among these was the fact that, in a labor market rendered highly competitive because of an elevated unemployment rate, employers would choose to hire someone without a recent history of heart disease rather than someone, like plaintiff, with such a history.

Defendant argues that such evidence was irrelevant because the legitimate inquiry should focus on the physical and mental capacity of the employee without consideration of the practices of employers. We disagree.

The test of "total disability" set forth in *Erreca* v. *West. States Life Ins. Co., supra,* requires that the real-world employment marketplace be considered in determining whether an insured is "totally disabled." Under that test, "total disability" is one that prevents the insured from working *with reasonable continuity* in his customary occupation or in any other occupation in which he might reasonably be expected to engage. (*Erreca* v. *West. States Life Ins. Co., supra,* 19 Cal.2d at pp. 394-395; followed in *Culley* v. *New York Life Ins. Co.* (1945) 27 Cal.2d 187, 191 [163 P.2d 698]; see fn. 7, *ante.*) One with a serious disability who cannot reasonably find work cannot work "with reasonable continuity." Evidence of plaintiff's actual employment prospects was relevant to show that, under the *Erreca* test, she could not, in fact, work with reasonable continuity.

Moreover, insurance law generally recognizes that the *actual* employment prospects of the insured are to be considered in determining the duties of an insurer under a disability policy. Thus, for example, it is the established rule that "in determining whether the insured is disabled to such an extent as to prevent him from engaging in any occupation or performing any work for any kind of compensation within the meaning of a [disability] policy, *the test is not some fanciful or imaginary occupation in which there is no likelihood of anyone employing the insured.*" (15 Couch, Insurance (2d ed. 1983) § 53:49, p. 82, italics added.) This rule recognizes that the ability of an insured to work cannot be rationally divorced from a consideration of the market for the insured's skills or services.

Defendant argues our result would transform a policy of disability insurance into a policy of unemployment insurance. Not so. Defendant overlooks

the fact that plaintiff's disabling illness was the predicate for the admission of evidence of the realities plaintiff faced in the job market. The relevant question was not simply whether plaintiff was unemployed but rather whether she was, in fact, unemployable because of her illness according to the *Erreca* test.

Defendant contends that to allow evidence of the realities of the job market would "defeat the clear intent of the parties." We reach precisely the opposite conclusion. "The insured in a contract like the one before us does not seek to obtain a commercial advantage by purchasing the policy—rather, he seeks protection against calamity. As insurers are well aware, the major motivation for obtaining disability insurance is to provide funds during periods when the ordinary source of the insured's income—his earnings—has stopped. The purchase of such insurance provides peace of mind and security in the event the insured is unable to work. [Citation.]" (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 819.) An insured under a policy of disability insurance has no interest in a hypothetical job market which does not, in fact, exist; that fictional employment arena will supply neither lost earnings nor peace of mind.

As our Supreme Court pointed out in *Egan, supra,* 24 Cal.3d 819, a disability insurer well knows that a disabled insured under such a policy expects to be covered for loss of earnings caused by an inability to work in the real world. In making a determination of employability, an insurer cannot reasonably expect to rely on the unsupported assumption that one who has a serious disability is able to compete for work on an equal basis with the nondisabled even assuming the skills of the disabled worker are otherwise equal. Indeed, defendant's own expert testified that, "If someone is employable it means they're capable of being employed on a competitive basis in the labor market, being paid a wage for their efforts. If they're totally disabled, it means they are not capable of performing any activity on a competitive basis."[11]

The court did not err in admitting evidence of attitudes and practices of employers in the current job market.[12]

---

[11]We reject the suggestion that insureds who become totally and permanently disabled in a time of high unemployment, and whose job prospects are consequently limited, will receive a windfall by the continuance of total and permanent disability during times of higher employment when they may be able to work. Defendant's policy provides that disability payments shall immediately cease whenever total and permanent disability terminates. Moreover, the policy gives the insurer the right periodically to require proof of such disability from the insured. (See *Erreca* v. *West. States Life Ins. Co., supra,* 19 Cal.2d at pp. 403-404.)

[12]Our conclusion also disposes of defendant's contention that the trial court erred in refusing the following instruction: "In determining whether a person is capable of returning

## II

### Jury Instructions

### A

█ Defendant contends the jury instruction defining total disability erroneously stated the law. Over defendant's objection the court, on its own motion, submitted an instruction defining total disability; such a procedure is proper. (Code Civ. Proc., § 608; *Dodge* v. *San Diego Electric Ry. Co.* (1949) 92 Cal.App.2d 759, 763 [208 P.2d 37].)

The court instructed the jury in relevant part as follows:

"The term 'total disability,' as applicable to the insurance policy involved in this case, is defined as a disability that renders one unable to perform with reasonable continuity the substantial and material acts necessary to pursue his usual occupation in the usual or customary way or to engage with reasonable continuity in another occupation in which he could reasonably be expected to perform satisfactorily in light of his *age, education, training, experience,* station in life, physical and mental capacity." (Italics added.)

Defendant and amici[13] argue that the addition of "age, education, training, [and] experience" substantially broadens the definition of total disability beyond that required by *Erreca.* We disagree.

"Age, education, training and experience" are simply specific ingredients of "physical and mental capacities." Indeed, in *Erreca,* the Supreme Court explicitly discussed each factor contained in the disputed instruction when the court noted, "although respondent is a shrewd farm executive and a successful grain operator, the testimony discloses that he has had little formal *education* and is neither *trained* nor qualified for any other occupation. And because of his *age* and *experience* in life, he probably could not prepare himself for other remunerative employment. Accordingly, the respondent must be deemed to be totally disabled if he is no longer able to pursue the

---

to any occupation in which she might reasonably be expected to engage in view of her station and physical and mental capacity, the standard in California for measuring total disability, you may not consider the fact that an employer may prefer to hire a person who has not had a heart attack over an equally qualified person who has had a heart attack. You also may not consider the difficulty in securing employment in a very competitive job market."

[13]An amicus brief has been filed by the Health Insurance Association of America and by the American Council of Life Insurance.

occupation of farmer or farm supervisor." (*Erreca* v. *West. States Life Ins. Co.*, *supra*, 19 Cal.2d at p. 395, italics added.) We find no error.[14]

## B

 Defendant requested that the jury be instructed in the following manner: "In order to award plaintiff Moore insurance benefits under [defendant's] insurance policy *you must find by a preponderance of the evidence that plaintiff Moore was totally and permanently disabled prior to September 1, 1975. It is not sufficient to find that plaintiff Moore later became totally and permanently disabled from a disease that had its onset before [defendant's] insurance policy terminated on September 1, 1975.*" (Italics added.)

The court refused the instruction on the ground the issue was covered by other instructions.[15]

Plaintiff contends the proposed instruction failed to state applicable law in that it violated the "process of nature" rule. "The 'process of nature' rule holds that, within the meaning of policy provisions requiring disability within a specified time after the accident, the onset of disability relates back to the time of the accident itself whenever the disability arises directly from the accident 'within such time as the process of nature consumes in bringing the person affected to a state of total [disability].' (*Schilk* v. *Benefit Trust Life Ins. Co.* (1969) 273 Cal.App.2d 302, 307 [78 Cal.Rptr. 60, 39 A.L.R.3d 1019].)" (*Willden* v. *Washington Nat. Ins. Co.* (1976) 18 Cal.3d 631, 635 [135 Cal.Rptr. 69, 557 P.2d 501].)[16]

Relying on dictum in *Austero* v. *National Cas. Co.*, *supra*, 84 Cal.App.3d 1,[17] defendant counters that the "process of nature" rule has been applied

---

[14]This conclusion disposes of defendant's contention that the court erroneously instructed the jury that the definition of total disability contained in the instruction has been the law in California since 1942.

[15]We have not located any other instruction covering the italicized portion of defendant's requested instruction.

[16]"The rationale for the rule is best set forth in *Rathbun* v. *Globe Indemnity Co.* (1921) 107 Neb. 18 [184 N.W. 903], wherein the court pointed out that it was a matter of common knowledge that in a large majority of instances in which bodily injuries are received, the real nature and extent of injuries are not revealed until sometime in the future and after the first pains have passed away. The court said: 'The injured part often lies dormant for an indefinite period, with but little or no consciousness of its existence by the person injured, although from the very moment of the accident, perhaps, the processes of nature may be busily engaged in developing what may have seemed to be but a slight hurt into a most serious and perhaps fatal injury.' (*Id.*, at p. 908.) The weight of authority is that in such instances the disability is held to be continuous from the date of the accident." (*National Life & Accident Ins. Co.* v. *Edwards* (1981) 119 Cal.App.3d 326, 332-333 [174 Cal.Rptr. 31].)

[17]As we have pointed out, *Austero* was disapproved on other grounds in *Egan* v. *Mutual of Omaha Ins. Co.*, *supra*, 24 Cal.3d at page 824, footnote 7.

in California only where disability policies have imposed contractual time limitations requiring that permanent disability actually occur either "immediately" or within several months of an "accident." (See generally *Willden* v. *Washington Nat. Ins. Co., supra,* 18 Cal.3d at pp. 635-636.) Thus, in *Austero, supra,* plaintiff was insured under a disability policy that contained no requirement that total or permanent disability occur within a specified number of days of an "accident." Plaintiff suffered from presenile dementia. Significant symptoms appeared during 1972 and early 1973. (*Austero, supra,* 84 Cal.App.3d at p. 9.) The policy lapsed in April 1973. (*Id.,* at p. 10.) The insurer contended plaintiff was not totally disabled during the time coverage was in effect; however, the *Austero* court found substantial evidence on the record that plaintiff had been totally disabled before the policy lapsed and upheld the jury's award of disability payments on that basis. (*Id.,* at p. 23.) In a footnote, the court opined that it would not apply the "process of nature" rule because "it would do a great disservice to both parties to totally ignore the clear terms of the policy and the expectations of the parties, and to construe the policy to allow coverage merely because plaintiff's presenile dementia *began* before the policy lapsed . . . ." (*Id.,* at pp. 22-23, fn. 20, italics in original.)[18]

In the instant case, we need not rely on the "process of nature" rule in order to uphold the trial court's refusal of defendant's requested instruction. Here, unlike *Austero,* the terms of the policy are hardly clear with respect to when plaintiff's disability had to become permanent. On the one hand, the policy provides in pertinent part: "Monthly disability instalments . . . shall be payable . . . provided:

"(a) the Employee furnishes the Company with due proof that while insured under the group policy . . . he has become totally and permanently disabled as defined below . . . ."

This language obviously suggests the employee must be both totally and permanently disabled before the policy lapses.

On the other hand, the policy also contains the following language: "Total disability is defined as disability, commencing after the Employee becomes insured under the group policy, resulting from bodily injury or disease which wholly prevents the Employee from engaging in any occupation or

---

[18]The *Austero* court did not indicate, nor can it be gleaned from the policy provisions stated in the opinion, what "clear terms" of the policy barred application of the "process of nature" rule.

employment for compensation, profit, or gain. Total disability during its continuance shall be presumed to be permanent if it is reasonably certain that such disability will continue during the remaining lifetime of the Employee. For the purpose of commencement of benefit payments only, any total disability which has existed for a continuous period of nine months will be presumed to be permanent. This does not preclude acceptance by the Company of proof of total and permanent disability prior to the completion of such nine month period."

This language strongly suggests that permanent disability need not be established within the policy period. First, total disability "during its continuance shall be presumed to be permanent if it is reasonably certain that such disability will continue during the remaining lifetime of the Employee." This language implies the employee is entitled to a period of "continuance" of total disability in order to establish with reasonable certainty that the total disability will continue for the lifetime of the employee. That notion is reinforced by later language providing that "any total disability which has existed for a continuous period of nine months will be presumed to be permanent." The language of the policy thus suggests that if, as in the present case, an employee becomes totally disabled near the end of the policy period, the employee is entitled to a period of at least nine months, including periods of time beyond the policy period, to demonstrate permanent disability based upon continuous total disability. Indeed, that construction is consistent with testimony given by defendant's manager of group claims, Whipple, who indicated it was defendant's claims practice to require that an insured be continuously disabled for nine months before benefits would be paid for permanent disability. It would be unreasonable to construe the policy to prevent an employee, who became totally disabled from illness the day before the policy lapsed, from demonstrating permanent disability in the manner required by defendant's claims practices.

 "'[A]ny ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates.'" (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764], quoting *Harris* v. *Glens Falls Ins. Co.* (1972) 6 Cal.3d 699, 701 [100 Cal.Rptr. 133, 493 P.2d 861].) Our interpretation of the instant policy leads us to conclude that plaintiff did not have to be permanently disabled within the policy period in order to receive disability benefit payments. Defendant's proposed instruction, suggesting the contrary, was erroneous and was thus properly refused. (*Shaw* v. *Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 158 [323 P.2d 391].)

### III

### *Punitive Damages*

■■■■ Defendant contends the punitive damage award of $2½ million is excessive. We examine the evidence on the issue in the light most favorable to the judgment. (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 819 [174 Cal.Rptr. 348].)

### A. *Punitive Award Compared to Compensatory Award*

Pointing to the rule that a small award of compensatory damages does not generally justify a disproportionally high punitive damage award (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980]), defendant argues that the punitive damage award is disproportionate to the $30,000 compensatory award. Defendant calculates the ratio between punitive and compensatory damages to be 83:1. It contends that ratio exceeds established ratios of compensatory-to-punitive damages approved by the appellate courts. We reject defendant's argument for several reasons.

First, defendant's premise is incorrect: the ratio between compensatory damage and punitive damage in this case is not unheard of. For example in *Neal* v. *Farmers Ins. Exchange, supra,* the California Supreme Court upheld a jury award consisting of $739,500 in punitive damages and $9,500 in compensatory damages, a ratio of 78:1. (*Id.,* at p. 920.) In *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266 [95 Cal.Rptr. 678], the Court of Appeal upheld an award of $200,000 in punitive damages and $1,050 in actual damages, a ratio of 200:1.

Second, there is no fixed ratio by which to determine the proper proportion between punitive and compensatory damages. (*Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19].) In a case such as this, where compensatory damages, based on policy limits, are modest, but where the jury heard evidence of fraudulent claims *practices* potentially affecting numerous insureds other than the plaintiff, strong reliance on the reasonable relation rule may defeat the object and purpose of punitive damages. (See *Chodos* v. *Insurance Co. of North America, supra,* 126 Cal.App.3d at p. 104; *Delos* v. *Farmers Insurance Group* (1979) 93 Cal.App.3d 642, 667 [155 Cal.Rptr. 843].) "If the overriding consideration in an award of punitive damages is whether it bears a reasonable relation to the actual damages suffered the result may be to thwart completely the purpose of punitive damages. One example of this is the situation where a plaintiff has suffered only minor injury or is only able to prove a small amount of actual damages,

yet the conduct of the defendant has been especially wanton or malicious. This would seem the precise situation in which a large award of punitive damages would be necessary to ensure that the defendant does not repeat his act and that others do not imitate him. Application of the reasonable relation rule, however, would limit the punitive damages to an amount not disproportionate to the actual damages suffered. This example illustrates the fact that in its operation the reasonable relation rule can ignore the punitive and deterrent functions of exemplary damages." (Comment, *Punitive Damages and the Reasonable Relation Rule: A Study in Frustration of Purpose* (1978) 9 Pacific L.J. 823, 839-840, fn. omitted; see also Morris, *Punitive Damages in Tort Cases* (1931) 44 Harv.L.Rev. 1173, 1181.)

In light of the fact that the jury's award was obviously designed to punish and discourage defendant's fraudulent claims practices, and not simply its handling of plaintiff's claim, we give the ratio of punitive to compensatory damages little weight.

B. *Punitive Award Compared to Wrongfulness of Conduct*

One factor to consider in evaluating an award of punitive damages is the particular nature of the defendant's acts in light of the whole record; in general, the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.) Defendant argues its conduct was not sufficiently reprehensible to justify the punitive award.

In particular, defendant points to the jury's finding that plaintiff suffered no emotional distress. As we have noted, however, we will not assume the jury's award of punitive damages was intended to punish defendant simply for its conduct toward plaintiff. In part, the jury's award of punitive damages obviously punished defendant for having engaged in a *practice* "firmly grounded in established company policy" (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 923) that had the potential of defrauding countless insureds other than plaintiff. (See *Delos* v. *Farmers Insurance Group, supra,* 93 Cal.App.3d at p. 664.)

The jury could reasonably conclude that certain aspects of defendant's deceptive claims practices were particularly invidious because lay persons would be unlikely to discover the deception. First, lay persons would be unlikely to know that they had an established right under California law to have coverage determined using the broader *Erreca* standard rather than the explicit language of defendant's policy. Second, defendant's denial of claims was ostensibly based on the opinion of the insured's own treating physician, who was also unlikely to know that defendant's definition of total

disability did not comply with California law. A jury could reasonably conclude that many insureds would not contest defendant's denial of coverage after the insured's own doctor had found them not totally disabled.

The jury could also properly find that its award of punitive damages was necessary not simply to punish defendant for past acts but also to get defendant to discontinue its deceptive practices. The evidence was uncontradicted that, despite actual knowledge that its claims procedures misstated California law, *defendant had not changed its claims review procedures even as of trial.* The jury could therefore reasonably conclude its award of punitive damages was necessary in order to get defendant's attention.

Defendant further contends its conduct is not sufficiently reprehensible because Dr. Swerdlow testified he would have given the same opinion, that Mrs. Moore was not totally disabled on January 13, 1976, even had he been furnished the *Erreca* definition of "total disability." Thus, defendant argues its misleading claims practices played no part in the denial of plaintiff's claim. Some context is necessary.

On October 28, 1975, defendant's claims examiner sent Dr. Swerdlow a letter setting forth the policy definition of "total disability" and asking Dr. Swerdlow for his opinion as to whether Mrs. Moore was totally disabled.[19] On January 13, 1976, the doctor replied, "Ms. Moore is not totally disabled at this time. However, she is unable to continue working as a bus driver as her bus driver license has been revoked because of her physical condition."

At trial, Dr. Swerdlow was asked if he would have given the same reply if the claims examiner's letter had asked whether Mrs. Moore could go back to her old occupation or another occupation in which she was reasonably fitted by her training, experience and background. The doctor answered, "Yes."

This single answer to a hypothetical question may not be taken out of context. The doctor testified that he in fact relied on the literal policy lan-

---

[19]The letter read in pertinent part: "We are in receipt of Ms. Moore filing a claim for the above benefit. [¶] In order to be eligible for this benefit, Ms. Moore must be totally disabled, 'resulting from bodily injury or disease which wholly prevents the employee from engaging in any occupation or employment for compensation, profit, or gain. Total disability during its continuance shall be presumed to be permanent if it continues during the remaining lifetime of the employee.' According to the claim form which was completed by you, under the Attending Physician's statement, you have indicated that Ms. Moore may resume work on November 15, 1975. Therefore, according to the above definition, do you believe Ms. Moore to be totally disabled? You may write your reply at the bottom or reverse side of this letter or on separate cover if you wish. [¶] Your assistance in this matter will be greatly appreciated."

guage in rendering his opinion of January 13, 1976, and that he believed the policy definition to be very severe and restrictive. He believed the policy definition meant that if Mrs. Moore could do *anything* toward *any* gainful occupation, that she was not totally disabled.

Doctor Swerdlow also testified he was unqualified to render an opinion as to Mrs. Moore's employability based on factors such as experience, education or prior job skills. The doctor stated, "predicting of people's occupational behavior following diseases just isn't a traditionally physician's role in practicing medicine. I would feel very awkward in telling somebody, well, you can go out and be something or other. We're just not—it's just not part of our job description." It was for the jury to determine whether Dr. Swerdlow would actually have rendered an opinion for which he was admittedly unqualified had defendant presented him with the *Erreca* standard. (See *Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d at p. 814.)

Moreover, the doctor's testimony indicates he was apparently confused by policy language included in defendant's letter stating, "Total disability during its continuance shall be presumed to be permanent if it continues during the remaining lifetime of the employee." We note preliminarily that inclusion of this language served no proper purpose in defendant's letter. The quoted language pertains to defendant's definition of *"permanent"* disability, not *"total"* disability. Defendant's letter asked only for an opinion of present "total" disability. (See fn. 19, *ante.*) Inclusion of this vague language of the policy related to permanent disability was irrelevant to defendant's inquiry and simply confused the doctor.

It is clear Dr. Swerdlow thought that Mrs. Moore was not "totally disabled" if she *might* be able to return to work at any time in the future. As of the date of his opinion letter, Dr. Swerdlow thought that Mrs. Moore should *try* to go back to work: "I felt that she had gone through her period of temporary total disability and that we could now see how she would respond to returning to some sort of gainful employment." The doctor felt, "It was a matter of watching her to see whether she could return [to work] as time passed by and she convalesced more and more from her original illness." Also, "at some future date she possibly might have achieved a state of health such that she would have the physical capacity to return to some sort of gainful employment."

This testimony indicates plaintiff was, in fact, totally disabled under the *Erreca* test on January 13, 1976, and that Dr. Swerdlow's opinion to the contrary was wrong. As we have noted, under *Erreca,* "total disability" is a disability that prevents the insured from working *with reasonable continuity.* (*Erreca* v. *West. States Life Ins. Co., supra,* 19 Cal.2d at pp. 394-

395.) The experimental return to work that the doctor thought would be good for Mrs. Moore cannot be construed as an opinion that she could work with reasonable continuity. The jury could conclude the doctor would have found plaintiff totally disabled had he been furnished with the *Erreca* definition rather than with defendant's irrelevant and confusing policy language.

Finally defendant contends it is not sufficiently culpable because defendant had no opinion from a physician indicating plaintiff was totally disabled and because it accurately reported to plaintiff that the denial of her claim was predicated on the opinion of her treating physician, Dr. Swerdlow. (Compare *Wetherbee* v. *United Insurance Co. of America* (1968) 265 Cal.App.2d 921, 931-932 [95 Cal.Rptr. 678].) Since defendant's claims practices were designed to obtain misleading opinions from treating physicians, the fact that defendant had no opinion indicating plaintiff was totally disabled is immaterial. Further, the fact that defendant dutifully reported Dr. Swerdlow's opinion to plaintiff is of no consequence, since, as we have seen, that opinion was simply wrong.

Looking at the record, as we must, in a light most favorable to the judgment, it appears the jury could properly have concluded the conduct of defendant in this case was highly reprehensible. (See *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 928-929.)

The jury could conclude that defendant consciously pursued a practice or policy of cheating insureds out of benefits by obtaining incorrect opinions of total disability from treating physicians. The jury could conclude that plaintiff's own treating physician was misled by defendant's systematic claims practices and that defendant acted in bad faith by summarily denying plaintiff's claim even though her treating physician had indicated she could not work at her regular occupation, driving a school bus. ▓ The jury's verdict is accorded great weight and "we may not tamper with it unless we can say, as a matter of law, that the jury acted from passion or prejudice." (*Pistorius* v. *Prudential Insurance Co., supra,* 123 Cal.App.3d at p. 554.)[20] On this record, we will not set aside the decision of the jury.

---

[20]In *Delos* v. *Farmers Insurance Group, supra,* 93 Cal.App.3d at pages 666-667, the Court of Appeal reluctantly refused to reverse an order of a trial court that had reduced an award of punitive damages where individual plaintiffs had proved deceptive claims practices. There, evidence was presented to the trial court indicating other actions were pending involving the same defendants and identical issues. (P. 666.) The Court of Appeal held a reduction proper "where there is the likelihood of several jury-imposed punitive damage awards, each of which is sufficient to punish in the entirety for the misconduct involved." (P. 667.) Assuming arguendo *Delos* states good law on this point, it is inapposite here. The trial court in this case had no evidence of other litigation involving defendant in which defendant had or would pay punitive damages. The Burley Lewis claim was paid without litigation; the Clayton Anderson lawsuit was settled without disclosure of whether any sums paid by defendant were for punitive damages.

## C. *Punitive Award Compared to Net Worth and Income*

Defendant argues that the punitive award is disproportionate to its net assets and income. An award of punitive damages should be large enough to punish and deter but not larger than necessary to serve this purpose. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.)

 Defendant argues that its liabilities actually exceeded its assets. Defendant's 1980 annual statement reported a *net* asset figure of $78,239,387. Defendant's gross assets exceeded $1 billion. Defendant's senior vice president and chief actuary testified that certain bonds and mortgage loans were carried on defendant's books at cost when actually their worth, at current market value, was 10 percent less. Consequently, defendant's vice president testified, defendant's assets were negative. The jury could have, and undoubtedly did, disbelieve this self-serving testimony. (See *Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 760 [161 Cal.Rptr. 322].) Defendant's annual report provided substantial evidence of the net and gross assets stated above. The jury's award represents only 3.2 percent of defendant's net assets and one quarter of 1 percent of its gross assets. In *Neal* v. *Farmers Ins. Exchange, supra,* the Supreme Court refused to set aside a punitive award representing $1/10$ of 1 percent of an insurer's gross assets. (*Neal, supra,* 21 Cal.3d at p. 929.) The award in the instant case is of the same relative magnitude and we also decline to set it aside. (Compare *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416] [punitive award constituting nearly one-third of defendant's net worth set aside].)

Defendant next argues the punitive award is disproportionate to its net income. Defendant's calculations disclose that for the years 1979 and 1980 its "net gain from operations before dividends to policyholders and federal income taxes" amounted to $45,369,076 and $49,182,695, respectively. Federal income taxes incurred for these same years amounted to $9,354,829 and $10,973,505, respectively. Dividends to policyholders for these same years amount to $21,172,664 and $26,757,124, respectively. Projections based on figures available for the first six months of 1981 would yield comparable figures for that year.

Both parties agree that the proportionality analysis should be based on net income figures. (*Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469, fn. 5 [136 Cal.Rptr. 653].) The parties disagree as to the proper definition of "net income." Defendant, citing *Pistorius* v. *Prudential Insurance Co., supra,* 123 Cal.App.3d 541, argues that net income should exclude federal income taxes and dividends. *Pistorius* simply noted that defendant therein had a "net income after taxes and dividends [of] $270

million;" (p. 554) it did not *hold* that a proper calculation of net income should exclude dividends. Plaintiff argues that net income should include both dividends and taxes.

We believe that "net income" should exclude federal income taxes and include dividends. Income tax is an expense any profit-seeking entity incurs as a consequence of doing business. Dividends, on the other hand, are profits pure and simple. The deterrent effect of punitive damages is derived from the impact of such an award upon the profits of a business. The award provides a pecuniary motivation to the owners of the business to see to it that the affairs of the business are conducted in harmony with established law.

The jury's punitive damage award in the instant case represents 3.4 weeks of defendant's 1980 net income. We are unable to say that this proportion is, as a matter of law, excessive. (See *Wetherbee* v. *United Ins. Co. of America, supra,* 18 Cal.App.3d at p. 271 [punitive award equal to one week's earnings not excessive]; see also *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 929; compare *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 824 [punitive award reversed where it represented more than seven months of company's net income].)

 Here, the jury's award was also scrutinized by an experienced trial judge on a motion for new trial. Although the trial court's determination is not binding upon a reviewing court, it is to be accorded great weight because having been present at the trial, the trial judge was necessarily more familiar with the evidence. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Chodos* v. *Insurance Co. of North America, supra,* 126 Cal.App.3d at p. 103.) When we review the record in light of this rule, we cannot conclude the trial judge was wrong. We affirm the award of punitive damages.

## IV

 Pointing to the absence of any attorney's fees clause in the applicable insurance policy, defendant contends the trial court erroneously awarded plaintiff $843,333.33 in attorney's fees.[21] Our review of the California cases bearing on the issue of attorney's fees in

---

[21]A contract between plaintiff and her attorney provided that the attorney for plaintiff receive one-third of any recovery as his fee. The figure arrived at by the court represented one-third of total damages awarded by the jury.

insurance bad faith cases leads to the conclusion defendant is correct and no attorney's fees were properly recoverable as damages.[22]

In *Mustachio* v. *Ohio Farmers Ins. Co.* (1975) 44 Cal.App.3d 358 [118 Cal.Rptr. 581], the plaintiff brought an action for the insurance company's bad faith opposition to plaintiff's claim under a fire insurance policy, even though plaintiff employed an attorney who successfully settled plaintiff's claim under the policy. At trial defendant offered evidence on the cost of that attorney's services; the trial court excluded the evidence. The Court of Appeal held the trial court's exclusion of the evidence was error because the item of damage was proximately caused by defendant's tortious conduct. (P. 363.) *Mustachio* noted that "There is no contention that defendants are liable for attorney's fees incurred in this action." (P. 362, fn. 4.)

In *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917 [122 Cal.Rptr. 470], plaintiff sued a title insurance company for negligent failure to discover and disclose a cloud on the title of plaintiff's property and bad faith failure to take affirmative action to remove the cloud. While the trial court permitted plaintiff to recover attorney's fees in connection with litigation with a third party regarding the title defect (p. 929), the Court of Appeal denied attorney's fees on appeal of the bad faith action because the policy did not contain an attorney's fees clause. (P. 951.)

In *Twentieth Century-Fox Film Corp.* v. *Harbor Ins. Co.* (1978) 85 Cal.App.3d 105 [149 Cal.Rptr. 313], the court modified the judgment of the trial court by deleting an award of attorney's fees for the prosecution of a bad faith action based on the insurance company's unreasonable failure to accept a third party's offer to settle within the policy limits. The court noted

---

[22]Plaintiff claims defendant waived its contention regarding attorney's fees by failing to object in the trial court. The record shows the parties stipulated that the issue of damages in the nature of attorney's fees would not be tried to the jury but was to be decided by the court in the event of a jury verdict for plaintiff. However, following the jury's verdict, and without conducting an evidentiary hearing or issuing a memorandum of intended decision (see Cal. Rules of Court, former rule 232(a); former Code Civ. Proc., § 632, amended by Stats. 1981, ch. 900, § 1, p. 3425), the trial court simply entered its award of damages for attorney's fees in the judgment. The record fails to indicate defendant ever received notice of the award of attorney's fees; there is nothing in the record to impeach the assertion in defendant's opening brief that it had no notice the court awarded fees until defendant obtained a copy of the judgment in January 1982. We conclude the trial court's failure to hold an evidentiary hearing or issue a memorandum of intended decision gave defendant no reasonable opportunity to object. Moreover, the position taken by defendant on appeal—that no attorney's fees whatsoever are proper—impliedly requests that this court reconsider our prior opinion in *Dinkins* v. *American National Ins. Co., supra,* 92 Cal.App.3d 222.]. That issue is purely one of law. "Although a party may ordinarily not change his theory on appeal, the rule does not apply when the facts are not disputed and the party merely raises a new question of law." (*UFITEC, S.A.* v. *Carter* (1977) 20 Cal.3d 238, 249, fn. 2 [142 Cal.Rptr. 279, 571 P.2d 990]; *Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 725-726 [344 P.2d 307].)

that generally attorney's fees are not a compensable item of damages unless authorized by statute (Code Civ. Proc., § 1021)[23] or agreement of the parties. (*Twentieth Century-Fox, supra,* at p. 115.) The court found "no sound reason in social policy why insurance companies who are tortfeasors should be singled out for . . . discriminatory treatment." (*Ibid.*)

In *Dinkins* v. *American National Ins. Co., supra,* 92 Cal.App.3d 222, this court reversed a bad faith judgment against an insurance company because of instructional error. We provided guidance for the trial court on remand concerning attorney's fees. The jury had awarded compensatory damages for breach of contract and emotional distress, and had also awarded punitive damages. (P. 224.) The trial court granted plaintiff an attorney's fees award representing the total value of services rendered minus that amount allocable to the punitive damage award. (P. 234.) This court directed the trial court to reduce the award further, limiting fees to services rendered for recovery of the contractual amounts only. Our opinion does not disclose whether the insuring agreement contained an attorney's fees clause.

In *Blake* v. *Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901 [160 Cal.Rptr. 528], the Court of Appeal held the trial court erred in denying defendant's motion for judgment notwithstanding the verdict because no substantial evidence supported the jury's finding that the insurance company unreasonably withheld benefits due under a life insurance policy. The court further held, "Likewise, without evidence of bad faith, there can be no consequential damages thereof, including attorney's fees." (P. 926.) Consequently, the court did not reach the issue of the propriety of attorney's fees.

▮▮▮▮ Finally, we come to a recent case directly on point. *Austero* v. *Washington National Ins. Co.* (1982) 132 Cal.App.3d 408 [182 Cal.Rptr. 919] held that, in the absence of an agreement between the parties, attorney's fees are not recoverable in a bad faith action against an insurance company. We see no need to repeat *Austero*'s analysis in redundant detail. Justice Kaufman reasoned that an award of such fees is generally prohibited in the absence of a statute or an agreement (Code Civ. Proc., § 1021) and that no exception to the general rule existed, e.g., "common fund," "private attorney general" (see *Serrano* v. *Priest* (*Serrano III*) (1977) 20 Cal.3d 25, 35-48 [141 Cal.Rptr. 315, 569 P.2d 1303]), or "third party tort" (see *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 149 [135 Cal.Rptr. 802]). (*Austero* v. *Washington Na-*

---

[23]Code of Civil Procedure section 1021 provides: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to costs and disbursements as hereinafter provided."

*tional Ins. Co., supra,* 132 Cal.App.3d at pp. 411-412.) *Austero* both distinguished and trimmed back *Mustachio, supra,* because it did not address the issue of attorney's fees for the *prosecution* of a bad faith action and also because *Mustachio* had improperly interpreted *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 785, 47 A.L.R.3d 286], a case also authored by Justice Kaufman. Finally, the court criticized *Dinkins* as incorrectly decided and unpersuasive in its reliance on *Mustachio. (Austero, supra,* 132 Cal.App.3d at p. 414.)

We agree with the rationale and holding of *Austero.* As Justice Kaufman noted, "There is no valid reason for not applying the legislatively prescribed rule (Code Civ. Proc., § 1021) in this action as it applies in all other actions. Litigants are entitled to equal application of the laws at the hands of courts no less than the Legislature." *(Austero, supra,* 132 Cal.App.3d at p. 416.) To the extent our prior opinion in *Dinkins* v. *American National Ins. Co., supra,* 92 Cal.App.3d 222, suggests a different conclusion, we disapprove it.

### DISPOSITION

That portion of the judgment awarding plaintiff damages as attorney's fees, in the amount of $843,333.33, is reversed. In all other respects the judgment is affirmed.

Blease, Acting P. J., and Sparks, J., concurred.

A petition for a rehearing was denied February 6, 1984, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied March 14, 1984.