Barry M. CARDINER, Plaintiff,

v.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, and Does 1 through 100, inclusive, Defendants.

Provident Life and Accident Insurance Company, Counterclaimant,

v.

Barry M. Cardiner, Counterdefendant.

No. CV00–2021DTAIJX.

United States District Court,
C.D. California.

July 10, 2001.

Frank N. Darras, Michael B. Horrow, David T. Bamberger, Shernoff Bidart Darras, Claremont, CA, for Plaintiff.

Stephen H. Galton, Ann C. Schneider, Edith S. Shea, Galton & Helm, Los Angeles, CA, for Defendants.

ORDER **GRANTING** DEFENDANT PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY'S REQUEST. FOR JUDICIAL NOTICE; AND **GRANTING** DEFENDANT PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TEVRIZIAN, District Judge.

## I. Background

### A. Factual Summary

This action is brought by Plaintiff Barry M. Cardiner ("Plaintiff") against Defendant Provident Life and Accident Insurance Company ("Provident") for breach of contract and breach of the duty of good faith and fair dealing.

The following facts are undisputed [1]:

As such, Plaintiff's attempt to create a genuine issue must fail. Moreover, upon a review of these declaration, it appears that these declarations contain contrasting opinions and

---

1. In his Separate Statement, Plaintiff attempts to dispute the proffered facts by listing the declarations he submitted in support of his opposition to this motion. Plaintiff does not specify which paragraphs or portions of the declarations controvert the fact at issue.

Provident issued individual disability Policy No. 6–335–8080449 ("Policy") to Plaintiff effective September 24, 1987. In September 1990, Plaintiff submitted a claim to Provident contending that on or after September 21, 1990, he was totally disabled from his occupation from dysthymic disorder and post-traumatic stress disorder ("PTSD"). His disability claim was supported by his attending psychiatrist, Dr. Davidson, who stated Plaintiff was "[u]nable to concentrate, relax, or work properly."

On an occupational questionnaire, Plaintiff described his job duties as a stockbroker as including "cold calls" to prospects, speaking to clients trying to sell them stocks and bonds, managing some clients' portfolios, and trading commodity futures and options. In explaining why his disability prevented him from performing such duties, Plaintiff stated that his extreme stress level and chronic depression caused physical and emotional pain which prevented him from doing his job. Provident confirmed with Plaintiff's employer, Oppenheimer, that he voluntarily resigned.

Following the 90 day elimination period in the Policy, Provident began paying Plaintiff's disability claim. As permitted by the Policy, Provident obtained periodic supplementary statements of claim from Plaintiff and attending physician's statements ("APS forms") from his treating physicians. Provident periodically solicited reports from Plaintiff's attending physicians throughout the course of his claim.

In late 1992, Provident requested information from his then treating psychiatrist, Geoffrey A. Tucker, including comment on rehabilitation efforts. Dr. Tucker advised that there was no goal to return Plaintiff to work as a stockbroker, due to "severe anxiety, depression and guilt." According to Dr. Tucker, Plaintiff "cannot drive by a brokerage house or listen to news of Wall Street without exacerbating his symptoms and decreasing his ability to function."

In an interview with Provident in December 1990, Plaintiff stated that he had earned in excess of $100,000 per year while working as a stockbroker at Oppenheimer & Company, that he was a "high producer," that he worked approximately 12 hours daily making "cold calls," and that he was "unable to deal" with the then current depressed stock market and that he had gone into a major depression. The interviewer noted "no outward indication either physical or mental of disability." However, during the interview, Plaintiff "reiterated the fact that due to stress, depression and anxiety caused by positive HIV testing, he stopped working at Oppenheimer." As a follow-up on the interview, Provident requested that Plaintiff give authorization to speak with Dr. Davidson regarding his claim of experiencing stress, depression and anxiety as a result of his positive HIV testing. Plaintiff responded that the interviewer had misunderstood, and that his illness "was brought on by [his] work," not his HIV status, and that he had merely "expressed to him [his] concerns on the effect that the work related illness would have on activating and accelerating the HIV virus."

In June 1991, Provident interviewed Plaintiff's supervisors at Oppenheimer. In contrast to Plaintiff's reports of work related stress, anxiety and depression, the supervisors reported that Plaintiff had "done fairly well as a salesman and displayed no outward signs of depression. He performed his duties like anyone else, and there were no problems with absenteeism, irritability, work deficiencies or for that matter any obvious work impairment. He did not complain of work stress to anyone, to their knowledge." Further,

conclusions of law rather than a dispute as to the accuracy of the proffered facts.

Plaintiff did not file a worker's compensation claim in connection with his purported work-related stress.

In June 1992, Plaintiff requested that Provident permanently waive its requirement of the submission of periodic APS forms. Provident informed him that it would consider modifying the frequency of the APS requirement after he was evaluated by an independent medical examiner, but, due to the psychiatric nature of his claim, a permanent waiver would not be appropriate.

On July 9, 1992, Plaintiff was examined at Provident's request by a psychiatrist, Bruce Kagan, M.D. As indicated by his report of the examination, Dr. Kagan took a thorough history from Plaintiff, who stated that his depression began in September 1989 due to work related stress, but he continued to work until he decided to stop working as a stockbroker in 1990. Plaintiff described his dissatisfaction of the long working hours associated with stockbrokering, guilt when clients lost money, and what he perceived to be unethical and possibly illegal activities which his employers required of him. Plaintiff reported that an unnamed internist "felt that all his symptoms were of psychological origin and not physical in nature and recommended a vacation." Plaintiff noticed a significant improvement in his symptoms, reporting that "[h]is physical symptoms took approximately six months to disappear." He further reported having stopped antidepressant medication in March 1991 "because of the improvement in his depressive symptoms." Plaintiff also stated that upon stopping work as a stockbroker, he undertook a variety of physical and mentally challenging activities, including art courses, scuba diving, and volunteer counseling of AIDS patients at the Shanti Foundation. Dr. Kagan's report of his mental status examination states:

> Appearance and behavior. The patient is neat, cooperative, and appropriately dressed. There is no psychomotor agitation or retardation. Sensorium is clear. He is alert and oriented x3. His cognitive functions appear grossly intact and his memory appears quite intact. Mood is mildly anxious. Affect is appropriate and wide-ranging. His thought is coherent, relevant, and goal-directed. There is no evidence of psychotic thinking. No hallucinations. No delusions. There is no suicidal or homicidal ideation.

Despite this relatively normal examination, Plaintiff's own noted improvement, and his ruling out a diagnosis of PTSD, Dr. Kagan gave Plaintiff a diagnosis of "major depression, recurrent, without psychotic features, in partial remission" and concluded that Plaintiff was totally disabled from performing the duties of his employment as a stockbroker in the usual and customary manner. While Dr. Kagan felt Plaintiff was disabled at that time, he commented, "It is ... possible, although it cannot be predicted with any certainty, that with further psychotherapy and appropriate medication the patient might possibly be able to resume his previous duties."

On July 22, 1992, Plaintiff's own attending psychiatrist, Dr. Davidson, had submitted an APS form stating that Plaintiff was no longer disabled at all from dysthymic disorder. With respect to Plaintiff's purported PTSD, Dr. Davidson opined that Plaintiff would be able to return to work by August 1992 except in "high pressured sales." Further, in a report dated November 6, 1992, Dr. Davidson further downgraded Plaintiff's disability, stating merely that his "post-traumatic stress symptoms remain so as to make work as a stockbroker unwise."

Dr. Kagan's report was referred to Provident's psychiatric consultant, who commented that it supported Plaintiff's claim. Provident thereafter routinely paid Plaintiff's claim and referred it to its "special handling unit," where attending physician's statements were required to complete APS forms only semi-annually (rather than monthly), and later only annually. However, Provident reserved its right to require more frequent APS forms in the event Provident determined that was appropriate.

Notwithstanding his claimed disability status, Plaintiff remained quite active during the pendency of his claim, as indicated by his comments to Dr. Kagan and the periodic claimant's statements he submitted to Provident and information obtained through discovery. For example, Plaintiff acted as a volunteer counselor with the L.A. Shanti Foundation, Counseling West, and/or AIDS Project Los Angeles from the commencement of his claim through September 1996. From January 1991 to June 1993, Plaintiff attended Ryokan College and earned a Master's Degree in Counseling Psychology. He interned at Counseling West to acquire the 200–250 hours of practicum necessary to earn his Master's Degree. He then completed 3000 hours (including counseling hours) required to obtain a Marriage, Family and Child Counselor ("MFCC") license, which he obtained in December 1997. He began private practice as a psychotherapist in September 1998 on his own, and later, also at Management Team Networks. Plaintiff continues his private practice—very successfully—to this day. He also dabbled in computer related activities with a couple of employers (DesignerNet and LFP, Inc.) from 1996 through 1998. Moreover, contraindicated by Dr. Tucker's opinion that the mere mention of Wall Street would set off Plaintiff's depressive symptoms, Plaintiff completed forms relating to financial accounts with PaineWebber, in which he

(a) designated his investment objectives as "growth" and "speculation," (b) acknowledged the "special risks associated with uncovered option writing which expose the investor to potentially significant loss," and (c) authorized and approved the trading of options in his account despite those risks; and Plaintiff engaged in occasional trading. Further, Plaintiff racked up significant credit card debt, much of which is attributable to dining out, travel and tennis. Indeed, Plaintiff's wild spending habits forced him to file a Chapter 7 bankruptcy petition in 1997.

In 1997, Plaintiff's file was transferred to Provident's psychiatric unit for further assessment of whether he remained "totally disabled." Provident determined that it would be appropriate to schedule a field visit with Plaintiff to assess his present condition, obtain additional medical records, and request additional independent medical examinations. Provident also asked Plaintiff to describe his current work in "computer consulting" as indicated in one of his statements.

On December 22, 1997, Provident interviewed Plaintiff again, and learned that he had completed his course work at Ryokan College, received his MFCC license, worked part-time as a psychotherapist in Beverly Hills, seeing four to six patients per week, and worked part-time for LFP Publications. The interviewer noted Plaintiff was "somewhat anxious" but was "healthy appearing with no outward indication of ill health." Plaintiff indicated that he was "asymptomatic for any HIV-related symptoms and does not take medication for this condition." However, Plaintiff continued to insist that he had " 'major depression' which is exacerbated by any thought or mention of the 'stock market' or whenever he 'thinks of Oppenheimer,' " as well as panic attacks and depressive moods.

On March 31, 1998, Plaintiff was examined at Provident's request by P. Jan Geiseler, M.D., a specialist in infectious diseases and an Associate Professor of Clinical Medicine at the University of Southern California Medical School. Dr. Geiseler evaluated Plaintiff's HIV condition and found that Plaintiff had not developed any opportunistic infections or other signs of AIDS, that he had maintained a regular schedule of activities except those of a stockbroker since September 1990, and that he was not taking any medications for his HIV condition, other than experimental anti-neoplastin drugs and anti-depressant medications for his psychiatric condition. Dr. Geiseler concluded that Plaintiff's HIV infection did not impair him from any regularly scheduled activities and that he did not seem to have any real effect from his chronic HIV infection. He deferred an opinion regarding Plaintiff's psychiatric condition to a specialist in that area. Provident's medical consultant, William Dowell, M.D., reviewed Dr. Geiseler's report and determined that it showed Plaintiff's HIV condition was not disabling.

Plaintiff was next examined by Charles H. Hinkin, Ph.D., a psychologist affiliated with the Neuro–Psychiatric Institute at UCLA Medical Center. Dr. Hinkin reviewed Plaintiff's medical records and other pertinent information provided by Provident from its claim file (including Dr. Geiseler's report) and evaluated Plaintiff on July 25, 1998. Dr. Hinkin took a thorough history and administered a battery of standard psychological tests to Plaintiff and concluded on the basis of the record review, psychological testing and his personal interview that Plaintiff had no cognitive deficits which would prevent him from returning to work as a stockbroker. In fact, Plaintiff tested within normal limits on all cognitive testing and "performed well on measures of executive, or frontal systems function, those behaviors which

monitor, direct, and control behavior." Further, although Dr. Hinkin found that Plaintiff had a low grade depression, he did not find it disabling, and found no signs of depression or anxiety during six hours of psychological examination. Dr. Hinkin reasoned that Plaintiff's endorsement of severe depressive symptoms could possibly have been "overstated ... in an effort to justify his disability claim" (although Dr. Hinkin ruled out "gross" exaggeration and malingering). Dr. Hinkin stated that Plaintiff's behavior pattern over the years since filing his claim "is not consistent with either major depressive disorder or PTSD—two diagnoses that he currently carries." Dr. Hinkin continued:

... Patients with such disorders do not have their symptoms remit as soon as they go on vacation. While it is possible that Mr. Cardiner's symptoms in 1990 were of sufficient severity and chronicity to warrant a diagnosis of major depressive disorder, given Mr. Cardiner's description of the fluctuating course of his symptoms, it instead appears that in 1990 Mr. Cardiner may have experienced an adjustment disorder with depressed and anxious features triggered by occupational dissatisfaction. By his report, he grew tired of the ethically questionable manner in which he sometimes felt compelled to act, felt bad when his investment advice failed to prove profitable, and grew to dislike the stress associated with working on a commission basis. Apparently, Mr. Cardiner found that the psychological price attendant to such a high stress job exceeded the financial benefits associated with such a career. Many individuals come to such conclusions in their life and opt to leave the 'rat race' and pursue less stressful alternative careers, or as Mr. Cardiner has done, pursue a career where one can 'give something back' to others. Such a career choice is com-

mendable. However, it appears to be a choice and not secondary to psychiatric disease or disorder. Indeed, it could be argued that attending graduate school and trying to create and manage a private practice is also quite stressful. Currently, based on his apparent adequate social and occupational functioning, Mr. Cardiner does not appear to be suffering from a disabling psychiatric disorder and clearly does not meet the diagnostic criteria for PTSD or major depressive disorder. The DSM–IV diagnostic criteria requires exposure to an extreme, traumatic stress involving death or serious injury or other threats to one's physical integrity or witnessing an event that involves death, injury, or a threat to the physical integrity of another person or learning about unexpected or violent death[,] serious injury or threats of death/injury experienced by a family member or close associate. Among the examples of such events listed in the DSM–IV, are torture, combat, and violent personal assault such as rape. A stressful job falls short of such standards and is not outside the range of usual human experience.

With regards to major depressive disorder, by the patient's report he does not suffer from clinically significant distress or impairment in social, occupational, or other important area of function. Rather, by his report, he is presently functioning quite well. Also, Mr. Cardiner reports periods of virtually symptom-free function, particularly when on vacation. Since major depressive episodes do not typically remit while on holiday, this too argues against a present diagnosis of major depressive disorder.

Dr. Hinkin also found it unlikely that Plaintiff's emotional symptoms correlated to his HIV positive status, a possibility raised by Dr. Kagan in 1992. Although Dr. Hinkin surmised that Plaintiff "might" experience a "relapse" of symptoms if he returned to stockbrokering, Dr. Hinkin concluded that Plaintiff was not totally disabled from his employment as a stockbroker, and that he had made a choice to avoid the stresses of that occupation to pursue a more rewarding career as a psychotherapist.

Provident determined that Dr. Hinkin's report did not support Plaintiff's disability claim. However, it sent a copy of the report to Plaintiff's psychiatrist, Dr. Tucker, and invited him to submit additional clinical information for Provident's review. After reviewing Dr. Hinkin's report and based upon the information received to date, Provident concluded that Plaintiff's career change was a "choice" and not secondary to psychiatric disease or disorder. On August 18, 1998, Provident wrote to Plaintiff notifying him that, on the basis of the conclusions of the two independent examiners, Dr. Geiseler and Dr. Hinkin, benefits would be discontinued on his claim. The letter stated that an additional three months of benefits through October 25, 1998 would be paid to aid in transition.

In conjunction with Dr. Hinkin's psychological evaluation, Plaintiff had also undergone an independent medical examination by Saul J. Faerstein, M.D., a psychiatrist. Plaintiff was examined by Dr. Faerstein on July 27, 1998 for three hours, and Dr. Faerstein reviewed pertinent medical records and other information provided by Provident, including the reports of Drs. Geiseler and Hinkin. Dr. Faerstein's opinion reaffirmed Provident's determination that Plaintiff did not return to stockbrokering due to choice rather than disability. Dr. Faerstein reported to Provident by telephone that Plaintiff had been depressed but was no longer totally disabled from working as a stockbroker and had made a choice to pursue an alternate occupation as a psychotherapist. In his October 6, 1998 report, Dr. Faerstein explained

that Plaintiff had had an episode of major depression in the early 1990s, but that the condition had remitted within the first year of treatment. Thereafter Plaintiff had functioned adequately so as to maintain an active social life, return to school and function successfully as a student, become a psychotherapist, and engage in a wide variety of activities without any significant impairment. Dr. Faerstein noted that Dr. Tucker's records did not reflect treatment consistent with a disabling illness and regarded Plaintiff's extensive activities since claiming disability:

> ... The records [of Dr. Tucker] which were reviewed of therapy between 1992 and 1998 were sparse and noted continuing anxiety and depression and the prescriptions of Xanax and Zoloft which remained unchanged. The attending physician's statements were essentially unchanged over a six year period with continuing documentation of disability based on a projection of what might occur should he return to his former occupation. No other antidepressants were tried until apparently 1998 when Wellbutrin was added to the regimen. These notes between 1992 and 1998 also do not document the extensive activities in which Mr. Cardiner has become involved, first as a volunteer and then a remuneration. The records do not document his return to school, his ability to obtain an advanced degree, to pass licensing examinations, and to function as a psychotherapist.

Dr. Faerstein's examination did not reveal any significant psychiatric illness, as he explained:

> It was my clinical opinion that Mr. Cardiner did not present as an individual with significant anxiety or depression. During the psychiatric examination I conducted, his affect was bright, alert, and cooperative, and he manifested none of the symptoms one would see in a depressed or anxious individual. Al-though he reported he was anxious because of the significance of the psychiatric evaluation for his disability status, he did not function or manifest any signs of anxiety during the three-hour examination. This was consistent with his presentation during the psychological testing as well.

Dr. Faerstein acknowledged that Plaintiff certainly had job dissatisfaction as a stockbroker, but that he was not disabled from performing the duties of his previous occupation. Dr. Faerstein believed that it was speculative as to whether Plaintiff's psychiatric symptoms might reoccur if he returned to his former occupation as a stockbroker:

> It is clear from listening to Mr. Cardiner describe his opinions about the brokerage industry that he objects to many of the practices of this industry and he has made a choice not to engage in many of the practices that other brokers and salesmen engage in because of his moral and ethical objections to those activities. I would agree with previous examiners that if Mr. Cardiner were to return to the brokerage industry and he were to engage in illegal and unethical practices in that industry, he would again become depressed and anxious and might manifest the same symptoms he had in 1990. However, I do not believe that if he returned to that industry where he functioned for ten years before his disability, practicing honestly and ethically as a stockbroker, he would necessarily experience any of these symptoms.

> Since his improvement during the first year of therapy after he left Oppenheimer Funds, Mr. Cardiner has carried on an active social and occupational life, first as a volunteer in his community, and then as a student obtaining an advanced degree and functioning as a psychotherapist. There are many stresses

in the life of a psychotherapist, including his work with AIDS patients and suicidal patients. I can assure you that the work of a conscientious psychotherapist involves stresses on a par with those in many other professions, but Mr. Cardiner does not report that any of his symptoms have impaired his work in this field and he is seeking to increase the number of hours he meets with patients.

\* \* \* \* \* \*

It is my assessment from the records reviewed, from Mr. Cardiner's presentation, and from his history that the symptoms of his initial Major Depressive Disorder remitted within the first year of treatment, and he had plateaued and functioned at an adequate level as to be able to maintain an active social life, to return to school, to function successfully as a student, to become a psychotherapist, and to engage in a wide variety of activities including vocational activities without any significant impairment. I did not find that he presently suffers from any significant impairment or disability from his psychiatric condition. I cannot say for sure whether this is due to the absence of any psychiatric disorder or to the successful treatment and the medications he currently takes. In either case, he is not psychiatrically disabled as a result of a psychiatric disorder.

The opinions offered by other evaluators that Mr. Cardiner would be disabled to be a stockbroker because of what might happen should he return to that environment appear to be speculative and appear certainly to be fueled by Mr. Cardiner's negative attitudes towards the brokerage business, which are understandable considering his experience there. Such beliefs and attitudes, however, are more consistent with the diagnosis of Occupational Problem rather [than] any psychiatric disorder which would disable him. This is the category in DSM–IV which describes "job dissatisfaction and uncertainty about career choices." Mr. Cardiner certainly has job dissatisfaction with the brokerage business, but he has no uncertainty about his career choices and appears to be happy, fulfilled,. and satisfied with his new career as a psychotherapist. Based upon his current diagnosis, appearance, level of function, and psychological capabilities, he is not disabled from performing the duties of his previous occupation. I believe he has made a conscious choice not to return to that profession, a choice he is certainly entitled to make.

Provident forwarded Dr. Faerstein's report to Dr. Tucker for review and comment.

In December 1998, Plaintiff provided recent reports of testing performed by his attending HIV specialist, Dr. Hitt, for Provident's consideration. Thereafter, Provident obtained updated medical records from Dr. Hitt. Provident reviewed the information and determined that it did not support disability from Plaintiff's HIV condition.

On March 29, 1999, Plaintiff wrote to Provident forwarding a package of reports rebutting the opinions of Provident's independent medical examiners. The packet consisted of separate lengthy reports from Dr. Tucker responding to both Dr. Hinkin's and Dr. Faerstein's reports, a report from Jane E. Lewis, Ph.D., a psychologist, and an October 6, 1998 letter regarding Plaintiff's HIV status from Dr. Hitt. Notably, Dr. Hitt's letter indicated that Plaintiff's HIV status had not significantly deteriorated. The rebuttal reports from Drs. Tucker and Lewis disputed the conclusions of Drs. Hinkin and Faerstein that Plaintiff was not psychiatrically disabled and had made a choice to change his occupation from a stockbroker to a psychotherapist.

Dr. Lewis' report was supported by the results of independent psychological testing of Plaintiff that she had conducted on December 14, 1998 and January 3, 1999.

Plaintiff's rebuttal reports were reviewed by a psychological consultant, David A. Goldsmith, Ph.D. Dr. Goldsmith found Dr. Tucker's "rebuttals" to be biased (due to his role as a supportive advocate for Plaintiff) and lacking in objective support. He also found Dr. Lewis's evaluation to be biased, flawed by her test selection, and lacking in objective support, but he deferred final comment pending review of her raw test data.

Dr. Lewis forwarded her raw test data on April 28, 1999. A "Patient Information" sheet contained in Dr. Lewis's records disclosed that Cardiner had been referred to her on December 13, 1998 by his attorney of record in this action, Frank Darras. Dr. Goldsmith reviewed the raw testing date from Dr. Lewis and rendered a final report on May 7, 1999. The raw data did not alter his earlier impressions. Dr. Goldstein opined that Plaintiff had developed an aversion to being a stockbroker, that he felt bad when he failed clients, that he found his work upsetting and stressful, that he wanted to escape and avoid a career in which he was unfulfilled and felt "trapped," and that he made a conscious choice not to pursue therapy goals that could have enabled him to return to work in his former occupation as stockbroker. Although Dr. Goldsmith found that Plaintiff met the diagnostic criteria for a mental disorder, he concluded that Plaintiff's mental disorder did not impose deficiencies that rendered him unable to accomplish the specific duties of a stockbroker.

Based on Dr. Goldsmith's analysis, Provident wrote to Plaintiff on August 13, 1999 reaffirming Provident's decision to discontinue further benefits to him, as previously communicated in Provident's August 18, 1998 letter.

Following the 90–day elimination period, Provident paid a total of $555,231 in benefits for the period between December 25, 1990 through October 25, 1998.

## B. Procedural Summary

On January 27, 2000, Plaintiff filed the Complaint in the Superior Court of the State of California for the County of Los Angeles.

On February 25, 2000, Provident filed a Notice of Removal of Civil Action based on diversity.

On March 24, 2000, Provident filed an Answer and Counterclaim for declaratory judgment.

On April 10, 2000, Plaintiff filed a Reply to Counterclaim.

On May 22, 2000, this Court held a Mandatory Status Conference and set the discovery cut-off date of December 29, 2000, the pre-trial conference date of March 12, 2001 and the trial date of May 8, 2001. Pursuant to stipulation, these dates were continued as follows: discovery cut-off date to March 30, 2001, the pre-trial conference date to June 11, 2001 and the trial date to August 14, 2001. Pursuant to stipulation, these dates were again continued as follows: discovery cut-off date to May 30, 2001 and the pre-trial conference date to July 9, 2001.

On June 18, 2001, Provident filed a Motion for Partial Summary Judgment, which is currently before this Court. Specifically, Provident seeks summary judgment with respect to Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing and Plaintiff's claim for punitive damages.

## II. Discussion

### A. Standard

Under the Federal Rules of Civil Procedure, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *See id.*; Fed.R.Civ.P. 56(e).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511. The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. *See Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989); *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987).

If the moving party seeks summary judgment on a claim or defense on which it bears the burden of proof at trial, it must satisfy its burden by showing affirmative, admissible evidence.

Unauthenticated documents cannot be considered on a motion for summary judgment. *See Hal Roach Studios v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir.1990).

On a motion for summary judgment, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. *See* Fed.R.Civ.P. 56(e). Declarations on "information and belief" are inappropriate to demonstrate a genuine issue of fact. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

### B. Provident's Request for Judicial Notice

■ Provident asks this Court to take judicial notice of the "Civil Minutes—General" dated February 10, 1999 pertaining to Provident's motion for summary judgment issued in an action filed in the United States District Court, Central District of California, entitled *Fontaine v. Provident Life and Accident Ins. Co.*, Case No. 97–7675 WDK (C.D.Cal. Feb. 10, 1999).

■ A court must take judicial notice if a party requests it and supplies the court with the requisite information. Fed.R.Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). This Court may take judicial notice of facts outside the pleadings without converting

the motion to one for summary judgment. *See Mack v. South Bay Beer Distributors,* 798 F.2d 1279, 1282 (9th Cir.1986) (citing *Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd.,* 245 F.2d 67, 70 (9th Cir. 1956)).

This Court may take judicial notice of its own records, and documents that are public records and capable of accurate and ready confirmation by sources that cannot reasonably be questioned. *See MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986) (courts may take judicial notice of matters of public record outside the pleadings); *United States v. Wilson,* 631 F.2d 118, 119 (9th Cir.1980) ("In particular, a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases.").

Based on the foregoing, this Court grants Provident's request and takes judicial notice of the aforementioned document.

### C. Analysis

**1. Summary judgment is warranted with respect to the first cause of action for breach of the covenant of good faith and fair dealing**

Provident seeks summary judgment with respect to Plaintiff's first cause of action for breach of the covenant of good faith and fair dealing.

At the outset, this Court notes that there is no dispute that from 1990 until 1997, Provident was properly paying disability benefits to Plaintiff. In 1997, Plaintiff's file was transferred to Provident's psychiatric unit for further assessment of whether he remained "totally disabled." On August 18, 1998, Provident wrote to Plaintiff notifying him that benefits would be discontinued on his claim, following an additional three months of benefits through October 25, 1998 to aid in transition. On August 13, 1999, Provident again wrote to Plaintiff reaffirming its decision to discontinue further benefits to Plaintiff. It is this termination of benefits which is the subject of this action.

 An insurer is subject to liability in tort when it unreasonably and in bad faith withholds payment of the claim of its insured. *See Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 818–19, 169 Cal. Rptr. 691, 620 P.2d 141 (1979). As one court has observed, "the ultimate test of liability in the first party cases is whether the refusal to pay policy benefits was unreasonable." *Austero v. National Cas. Co.,* 84 Cal.App.3d 1, 32, 148 Cal.Rptr. 653 (1978). The breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself. *See California Shoppers, Inc. v. Royal Globe Ins. Co.,* 175 Cal. App.3d 1, 54–55, 221 Cal.Rptr. 171 (1985). "Bad faith implies unfair dealing rather than mistaken judgment ...." *Id.* (internal quotations and citation omitted). An insurer may be found liable in bad faith if it fails to adequately investigate a claim (*see Egan,* 24 Cal.3d at 817, 169 Cal.Rptr. 691, 620 P.2d 141), denies coverage based on an unduly restrictive policy interpretation or standard known to be improper (*see Love v. Fire Ins. Exch.,* 221 Cal. App.3d 1136, 1148, 271 Cal.Rptr. 246 (1990)), unreasonably delays in processing or paying claims (*see id.*), or forces the insured to file suit in order to recover policy benefits (*see Brandt v. Superior Court,* 37 Cal.3d 813, 820, 210 Cal.Rptr. 211, 693 P.2d 796 (1985)). It is noted, however, that even where a claim is ultimately found to be payable under policy terms, a court can conclude as a matter of law that the insurer's denial of a claim is not unreasonable. *See Franceschi v. American Motorists Ins. Co.,* 852 F.2d 1217, 1220 (9th Cir.1988). "The reasonableness of an insurer's claims handling

conduct in a first party coverage case becomes a question of law, properly determined on summary judgment, where the evidence is undisputed and but one inference can be drawn. [Citations omitted.]" *Nager v. Allstate Ins. Co.*, 83 Cal.App.4th 284, 288, 99 Cal.Rptr.2d 348 (2000).

Plaintiff argues that Provident breached its implied duty of good faith and fair dealing based on the following: (1) unreasonable failure to pay benefits; (2) failure to objectively investigate; (3) failure to thoroughly investigate; (4) conducting unnecessary investigation; (5) misrepresenting policy provisions; (6) failing to give legal definition of "disability" to IME (independent medical examination) doctors; (7) interpreting disability policy provisions inconsistent with California law; (8) failing to promptly investigate and communicate; and (9) imposing additional preconditions beyond policy. In support of his argument, Plaintiff offers specific instances of what he alleges is bad faith. This Court addresses each in turn.

### a.

■ Plaintiff argues that all of Plaintiff's treating physicians found him disabled, including Provident's own chosen psychiatric examiner, Dr. Kagan, and psychological consultant, Dr. Gray.[2] It is undisputed that these doctors did find Plaintiff disabled; however, their findings took place in 1990 to 1993. As such, this Court fails to see the relevance of this argument since Provident based its decision to terminate benefits based on its review of Plain-

tiff's status just prior to its decision. Indeed, Plaintiff attempts to make much of the fact that Provident "disregards the in-house and consultant physicians who had advised that the insured was disabled" and attempts to establish bad faith by Provident's re-evaluation in 1997. Provident responds that it was entitled to investigate and evaluate Plaintiff's claim on a periodic basis to determine whether he was entitled to further benefits, even though he has been paid benefits in the past. This Court agrees. Courts have held that the insurer has the right and opportunity to examine the insured when and so often as it may reasonably require. *See Erreca v. Western States Life Ins. Co.*, 19 Cal.2d 388, 401, 121 P.2d 689 (1942) (citing Sec. 10, 339, Ins.Code). "[T]he right periodically to examine the insured for proof of continued disability is a condition to the future liability of the insurer provided the policy so recites." *Id.* Here, the Policy provides that Provident has the right to have the insured examined "as often as is reasonable while a claim is pending." (*See* Provident, Exh. 1, Policy at p. 16.) Thus, the mere fact of Provident's investigation in 1997 is insufficient to evidence bad faith.[3]

### b.

■ Plaintiff argues that Provident used medical examiners—Drs. Hinkin, a psychologist, and Faerstein, a psychiatrist—who were blatantly biased in favor of insurer defendants and not independent of each other. In support of this argu-

---

**2.** In 1992, Plaintiff's claim was referred to Dr. Gray, Provident's psychological specialist consultant, who wrote a claim file note stating that the case is legitimate, that the IME supports the claim and that he discussed this case with a stockbroker and that "it fits 100 percent."

**3.** In addition, Provident states that in 1997, it determined that, in retrospect, it had been liberal in its investigation of Plaintiff's claim

since Plaintiff remained quite active during the pendency of his claim, to an extent completely at odds with his diagnosis. This Court also agrees with Provident that Plaintiff could have suffered no harm from Provident's earlier lapses in investigation; if Plaintiff was not "totally disabled" for any portion of time between the commencement and termination of his claim, then Plaintiff benefitted significantly.

ment, he lists the "track records" of Drs. Hinkin and Faerstein. For example, he provides the following: since 1990, there have been 20–25 times that Dr. Hinkin has been engaged to provide expert testimony, and in all those cases, Dr. Hinkin was hired by an insurance company or its lawyer; Dr. Hinkin has never given testimony for an insured; during 1997–1999, Dr. Faerstein was paid by Provident 18 times to perform independent medical examinations of Provident insureds. Plaintiff provides the following regarding the relationship between Dr. Hinkin and Dr. Faerstein: they had worked together on lawsuits in the past; they are friends; Dr. Faerstein regularly selects and recommends Dr. Hinkin in cases where Dr. Faerstein is retained as an expert; there were six disability cases in which Dr. Hinkin and Dr. Faerstein were retained by the same insurance company in 1998–1999. Defendant responds that this evidence does not support bias. This Court agrees.

The mere fact that these doctors have been hired by insurers rather than insureds does not support bias. Indeed, if this were the case, then most experts in any case would be deemed bias. Significantly, Plaintiff offers no evidence that these doctors routinely find for the insurer when faced with contrary evidence. With respect to the relationship between Drs. Hinkin and Faerstein, Plaintiff attempts to raise suspicion which is unsupported by the facts. As Provident points out, Drs. Hinkin and Faerstein are both affiliated with the UCLA Medical School. As such, it is not surprising that they are friends and have worked together. Plaintiff also attempts to make much of the fact that Dr. Faerstein waited for Dr. Hinkin's report before he completed his own. However, Dr. Faerstein offered a reasonable explanation:

An independent psychiatric examination depends on a number of data bases to reach a conclusion. It includes the ex-

amination of the claimant, but it also includes a review of past treatment records, in includes review of materials concerning his work, it includes any other evaluations, medical records that may be present, treatment records, evaluations, but it also includes psychological testing which is an integral part of the psychiatric evaluation, and Dr. Hinkin had done psychological testing, and the results of the testing were a very important part of the opinion that I was going to reach concerning dysfunctional level, impairments, and that data is part of my opinion.

(*See* Schneider Decl., Exh. 48.) Thus, Plaintiff's attempt to base his bad faith claim on the above evidence fails.

*c.*

■ Plaintiff argues that Provident terminated benefits without having received an IME report from Dr. Faerstein which Provident said would be important to the future consideration of his claim. Provident does not dispute this, but it argues that it ultimately considered that report before making its final claim determination.

This Court agrees that Provident erred in communicating to Plaintiff that his examination by Dr. Faerstein would be important to the consideration of his claim and then terminating his benefits prior to receiving Dr. Faerstein's report. However, this Court disagrees that its doing so rises to the level of bad faith. Provident's August 18, 1998 letter terminating Plaintiff's benefits is clear that its decision was based on the examinations by Drs. Geiseler and Hinkin; it did not represent that it had received a report by Dr. Faerstein. Dr. Geiseler concluded that Plaintiff's HIV infection did not impair Plaintiff from any regularly scheduled activities and that he did not seem to have any real effect from his chronic HIV infection. Provident's medical consultant reviewed Dr. Geiseler's

report and determined that it showed Plaintiff's HIV condition was not disabling. Dr. Hinkin concluded that Plaintiff was not totally disabled from his employment as a stockbroker and that Plaintiff made a choice to avoid the stresses of that occupation to pursue a more rewarding career as a psychotherapist. Based on these two doctors' reports, Provident discontinued Plaintiff's benefits, and in doing so, this Court concludes that Provident acted reasonably as a matter of law.

Following the termination of benefits, Provident received Dr. Faerstein's report. Dr. Faerstein's report ultimately confirmed Provident's denial of benefits because it concluded that Plaintiff was not disabled from performing the duties of his stockbroker occupation. Thus, while this Court cannot rely on Dr. Faerstein's report to support a conclusion that Provident acted reasonably at the time it terminated benefits in August of 1998, Dr. Faerstein's report supports the reasonableness of Provident's actions in dealing with Plaintiff's claim after August 1998. Of course, if Dr. Faerstein's report had not supported Provident's termination of benefits and Provident maintained its denial, then a bad faith claim would be more viable.

Plaintiff further argues that since Provident denied coverage without having received Dr. Faerstein's IME report, the IME report was not reasonably required for, or material to, the resolution of a claim dispute, and therefore, requiring Plaintiff to attend that IME was an act of bad faith. This Court disagrees with this argument. There is no evidence that Provident intended to disregard Dr. Faerstein's report. Indeed, Dr. Faerstein's report was forwarded to Dr. Tucker, Plaintiff's treating physician, for comment and review, and Dr. Tucker issued a report rebutting Dr. Faerstein's and Dr. Hinkin's reports. Dr. Tucker's rebuttal report, along with Dr. Lewis's, were reviewed by a psychological consultant, Dr. Goldsmith, who concluded that Plaintiff's mental disorder did not impose deficiencies that rendered him unable to accomplish the specific duties of a stockbroker.[4]

### d.

In support of his bad faith claim, Plaintiff states that Provident never gave the rebuttals by Drs. Tucker and Lewis to Drs. Hinkin and Faerstein, the doctors whose findings were being challenged. This Court fails to see the significance of this argument. Provident never represented to Plaintiff that this would be the process by which it would review Plaintiff's claim. In addition, it would appear to be an exercise in futility for the doctors involved to continually review each other's rebuttal reports. In any event, the rebuttal reports were reviewed by a psychological consultant, Dr. Goldsmith. Dr. Goldsmith found Dr. Tucker's report to be biased and lacking in objective support, and he found Dr. Lewis's evaluation to be biased, flawed by her test selection and lacking in objective support, but he deferred final comment pending review of her raw test data. Dr. Goldsmith then rendered a final report upon receipt of this raw test data from Dr. Lewis, which did not alter his earlier impressions.[5]

4. Plaintiff argues that Provident denied coverage based on Dr. Hinkin's report without even having given that report to Plaintiff's treating physicians for review and comment. However, it is undisputed that Dr. Tucker received Dr. Hinkin's report shortly thereafter and wrote a rebuttal report and that Dr. Lewis also wrote a rebuttal report on behalf of Plaintiff, and that both reports were received and considered by Provident in reaffirming its decision to discontinue benefits.

5. Plaintiff also argues that Provident improperly used a review by Dr. Goldsmith, an in-house employee psychologist who never met or examined the insured, to uphold its termi-

### e.

Plaintiff argues that bad faith is evidenced by the concealment of the opinions of Drs. Hinkin and Faerstein from Plaintiff by instructing them to not share the report and findings of the IME with the insured. This Court finds no "concealment." Provident provided the reports to Plaintiff's treating physician and stated:

> The report has not been shared with your patient. We offer the report to you as a courtesy and in the event that it may contain useful information for your consideration. It is up to your best clinical judgment to share or discuss the findings of the report with your patient.

### f.

█ Plaintiff claims that bad faith is evidenced by the fact that all of the examiners agreed that there is a significant risk of relapse should Plaintiff return to his stockbroker occupation. However, Plaintiff oversimplifies the examiner's statements.

Dr. Hinkin stated that "given his history and current aversion to his old career, it would not be surprising to see a similar symptom constellation to what he suffered in 1990 re-occur should he return to work as a stockbroker," and he also stated that Plaintiff "does not appear to be suffering from any cognitive or affective impairments that would prevent a return to work (though it is entirely possible that he might suffer a relapse should he do so)." These statements must be read in conjunction with the rest of Dr. Hinkin's report. Dr. Hinkin stated that Plaintiff experienced a significant degree of psychiatric distress in 1990 and that his job was undeniably stressful and high pressure and likely was the primary precipitant of that psychiatric disorder. However, because

Plaintiff reported that when he took a vacation, his symptoms entirely remitted, only to reoccur when he returned to work and that once he went out on disability, his symptoms dissipated so much that Plaintiff admitted to periods with virtually no symptomatology, Dr. Hinkin found that Plaintiff "may have experienced an adjustment disorder with depressed and anxious features triggered by occupational dissatisfaction." Importantly, Dr. Hinkin concluded that Plaintiff does not appear to be suffering from a disabling psychiatric disorder and that "it appears that [Plaintiff] has chosen to make a career change because he has found work as a stockbroker to be too stressful and insufficiently rewarding" and that this "appears to be a choice and not a result of psychiatric impairment."

Similarly, Dr. Faerstein stated that "if [Plaintiff] were to return to the brokerage industry and he were to engage in illegal and unethical practices in that industry, he would again become depressed and anxious and might manifest the same symptoms he had in 1990." However, Dr. Faerstein continued to state that he "do[es] not believe that if he returned to that industry where he functioned for ten years before his disability, practicing honestly and ethically as a stockbroker, he would necessarily experience any of these symptoms." Importantly, he further stated:

> The opinions offered by other evaluators that [Plaintiff] would be disabled to be a stockbroker because of what *might* happen should he return to that environment appear to be speculative and appear certainly to be fueled by [Plaintiff's] negative attitudes towards the brokerage business, which are understandable considering his experience

---

nation of benefits. Again, Plaintiff imposes a requirement which he may deem important, but this Court must look to what was actually

done by Provident to determine whether it acted in bad faith.

there. Such beliefs and attitudes, however, are more consistent with the diagnosis of Occupational Problem rather than any psychiatric disorder which would disable him.

(Emphasis in original.)

Thus, based on the entire context of these doctors' statements regarding a risk of relapse, this Court concludes that Plaintiff's bad faith argument fails as a matter of law.[6]

### g.

Plaintiff argues that Provident failed to inform either Dr. Hinkin or Dr. Faerstein about California's definition of "disability" and that it instead instructed these doctors to apply the Policy definition of "disability," which requires a greater showing than allowed under California law. This Court finds that these arguments lack merit.

In its letter to Drs. Hinkin and Faerstein, Provident clearly set forth the Policy definition of disability. Specifically, it provided:

DEFINITION OF DISABILITY:

'Totally disabled means the inability to perform the material and substantial duties of your occupation.'

'Under the personal attendance of a physician which is appropriate for the condition causing disability.'

(*See* Provident Exh. 18, p. 18–3; Exh. 20, p. 20–3.) This definition is the definition provided in the Policy. (*See id.* at Exh. 1.)

With respect to his argument that Provident required a greater showing of disability than required by California law, Plaintiff relies on the case of *Moore v. American United Life Ins. Co.*, 150 Cal. App.3d 610, 197 Cal.Rptr. 878 (1984). However, in *Moore*, the policy at issue was a general, non-occupational disability policy, which indemnifies against total and permanent disability which prevents the insured from performing the work of any occupation (*see id.* at 716, 197 Cal.Rptr. 878); whereas, here, the policy at issue is an occupational disability policy, which indemnifies against total and permanent disability which prevents the insured from performing the duties pertaining to a defined occupation. Under a general, non-occupational disability policy, "total disability for purposes of coverage results whenever the employee is prevented from working 'with reasonable continuity in his customary occupation or in any other occupation in which he might reasonably be expected to engage in view of his station and physical and mental capacity.'" *Id.* at 618, 197 Cal.Rptr. 878 (quoting *Erreca v. West. States Life Ins. Co.*, 19 Cal.2d 388, 394–395, 121 P.2d 689 (1942)). Thus, Plaintiff's reliance on this case and this definition of total disability is misplaced.

### h.

Finally, in an attempt to bolster his bad faith claim, Plaintiff offers a list of things which he argues Provident did not do or did improperly. Because each of these items standing alone lacks much merit, it is clear that Plaintiff is merely attempting to establish "quantity" over "quality" in the hopes that a bad faith claim will emerge. This Court concludes that Plaintiff's attempt fails.

Plaintiff asserts the following: the doctors Provident utilized did not speak with the treating physicians; Provident committed numerous delays in providing Plaintiff with copies of Dr. Hinkin's raw data and Dr. Faerstein's report and in responding

---

6. Plaintiff also relies on a case, *Brosnan v. Provident Life and Accident Ins. Co.*, 31 F.Supp.2d 460 (E.D.Pa.1998), for the proposition that failure to consider the risk of relapse is compensable. However, in *Brosnan*, the Court was examining a breach of contract claim and concluded that the record contained sufficient evidence from which a reasonable jury could find that the plaintiff is totally disabled as defined in the policies.

to letters and phone inquiries from Plaintiff and Dr. Tucker; Provident instructed Drs. Hinkin and Faerstein to "objectify any subjective self-reports by the Insured through interviews with collateral sources" and "comment[ ] upon whether the insured is vocationally impaired based on objective information"; Lucy Baird, author of the August 18, 1998 denial letter, failed to speak with the doctors [7]; Darrin Robinson, a subsequent claims representative assigned to Plaintiff's case, did not speak to any of the doctors.[8]

Precedent dictates that the insurer is subject to liability in tort when it unreasonably and in bad faith handles, or withholds payment of, the claim of its insured, and several examples of such bad faith have emerged, as discussed above. In analyzing the particular facts of a case, this Court must look to the actions of the insurer in its handling of the claim at issue. While certain actions that an insurer may have failed to take are important in analyzing its overall handling, a mere recitation of actions that an insurer should have taken is not dispositive. Indeed, if this were the case, then most insureds could easily claim bad faith. As this Court has previously stated, "[t]hat Defendant did not exhaust all possible tests is not dispositive." *Phelps v. Provident Life and Accident Ins. Co.*, 60 F.Supp.2d 1014, 1023 (C.D.Cal. 1999). Here, Provident paid disability benefits to Plaintiff for approximately 7 years. It then reevaluated Plaintiff's claim. As detailed in the undisputed facts, Provident then interviewed Plaintiff, had Plaintiff examined by Dr. Geiseler, and then by Dr. Hinkin. As a result of these examinations and resulting reports, Provident terminated benefits. This Court has read the reports of Drs. Geiseler and Hinkin, and based on the facts presented above and these reports, this Court concludes that Provident acted reasonably as a matter of law. In addition, following this initial denial, it is undisputed that Plaintiff was examined by Dr. Faerstein, that Plaintiff provided rebuttal reports and recent reports of testing performed by his attending HIV specialist, that these reports were reviewed by Dr. Goldsmith and that Provident then reaffirmed its decision to discontinue further benefits. Again, this Court has read these subsequent reports, and based on the facts and these reports, concludes that Provident acted reasonably as a matter of law. It is not unreasonable for an insurer to resolve good faith doubts about the claim against the claimant. It is well-established that the insurer is entitled to give its own interests consideration in addition to those of its insured. *See id.*

In sum, the record in this case supports a conclusion that, at a minimum, there existed a genuine issue as to Provident's liability. With respect to the breach of contract claim, a fact finder may ultimately disagree with the opinions of the medical examiners relied upon by Provident, but nothing in the record suggests that these examiners rendered opinions without bases and that Provident unreasonably relied upon them. Indeed, while ultimately it may be found that Plaintiff is totally disabled and benefits may be owed to Plaintiff, Provident had a reasonable basis to terminate benefits at that time.

*i.*

 Finally, this Court notes Plaintiff's proffered explanation as to why Provident assertedly acted in bad faith. He claims that during the 1980's, Provident had aggressively marketed it form 335 policy, which is the one Plaintiff purchased. He states that these policy provisions were so liberal that Provident ultimately took a

---

7. Plaintiff lists other things Ms. Baird did not do. (*See* Opposition, p. 12.)

8. Plaintiff lists other things Mr. Robinson did not do. (*See* Opposition, pp. 15–16.)

$423 million charge to create a reserve for expected future losses. He states that the only way that Provident could limit its losses was to improperly use the claim department to help improve profitability and that Provident targeted certain known problem areas—including mental/nervous claims—for aggressive claims handling, focusing on more "skillful" selection of IME doctors and measuring employee success in terms of claim terminations.

In opposition, Provident offers its explanation as to why and how it changed its business as a result of a stagnancy in 1993. It also asserts evidentiary objections to Plaintiff's declaration submitted in support of Plaintiff's argument.

This Court does not need to address the legitimacy of Provident's business reorganization. Even if this Court accepted Plaintiff's evidence, Plaintiff fails to establish any link between Provident's actions with respect to this specific claim and the alleged plan attributed to Provident. For example, Plaintiff fails to show how the "practice" of denying claims affected and influenced the denial of his specific claim in particular. Nonetheless, as detailed above, Plaintiff's claim was individually examined, and Plaintiff's proffered evidence of a change in Provident's "goals" does not create a genuine issue for trial.[9]

### j.

In sum, Provident has shown the absence of a genuine issue for trial, and Plaintiff has failed to set forth specific facts showing that there remains a genuine issue for trial. Thus, in light of the foregoing analysis, this Court concludes that

Provident is entitled to summary judgment with respect to Plaintiff's first cause of action for breach of the covenant of good faith and fair dealing.

### 2. Plaintiff's Claim For an Award of Punitive Damages is Moot

With respect to his first cause of action for breach of the covenant of good faith and fair dealing, Plaintiff seeks an award of punitive damages. Provident contends that it is entitled to judgment on Plaintiff's punitive damages claim. Based on this Court's conclusion that Provident is entitled to summary judgment with respect to Plaintiff's first cause of action, the issue of punitive damages is necessarily moot.

### D. Conclusion

Accordingly, this Court **grants** Defendant Provident Life and Accident Insurance Company's Motion for Partial Summary Judgment.

IT IS SO ORDERED.

---

**9.** Based on this determination, Provident's objections to the portions of the Declaration of Stephen Prater offered in support of this argument are necessarily moot. In addition, Provident asserts objections to the declarations of Andrew Bernstein, Mark Mills, and David Bamberger, submitted by Plaintiff. This Court notes that the majority of the content of these declarations mirror the arguments made by Plaintiff herein and is offered to support Plaintiff's arguments. To the extent that this Court has considered said evidence in its analysis, the objections are overruled, and to the extent said evidence has not been relied upon, said objections are deemed moot.